532 A.2d 346

George HATCHARD and Mt. Pocono
AMC/Jeep, Inc., Appellants,

v.

WESTINGHOUSE BROADCASTING COMPANY and
KYW–TV 3, Appellees,

Zigmond LEFKOSKI, Jr., Appellant,

v.

NEP COMMUNICATIONS, INC., t/d/b/a
WNEP–TV News, Appellee.

Supreme Court of Pennsylvania.

Argued Jan. 28, 1987.

Decided Oct. 15, 1987.

James E. Beasley, Keith S. Erbstein, William P. Murphy, Philadelphia, for Hatchard et al.

Charles J. Bufalino, Jr. and Charles J. Bufalino, III, West Pittston, for Lefkoski.

Jerome J. Shestack, Carl A. Solano, Gayle Chatilo Sproul, Samuel E. Klein, Philadelphia, for Westinghouse et al.

Lawrence M. Ludwig, Bruce L. Morgan, Scranton, for NEP Communications.

Kim R. Tulsky, Philadelphia, amicus curiae, for Caulkins Newspapers, Inc. and Mgty. Publishing Co.

Jane E. Kirtley, Washington, D.C., for The Reporter's Commission for the Freedom of the Press, et al.

Irwin Karp, for The Authors League of America, Inc.

Before NIX, C.J., and FLAHERTY, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

These consolidated appeals present the question of whether the Pennsylvania Shield Law, 42 Pa.C.S. § 5942(a), protects from discovery by a plaintiff in a libel action all unpublished documentary information gathered by a television station.

Both appeals arise out of libel actions against local television stations and their parent broadcasting companies for news broadcasts that allegedly defamed the respective plaintiffs. In the first case, appellants George Hatchard and Mount Pocono AMC/JEEP, Inc., ("Hatchard") sued appellees Westinghouse Broadcasting Company and KYW–TV ("KYW"), complaining that certain news reports concerning Hatchard's sale of automobiles to the City of Philadelphia defamed Hatchard. On February 11, 1982 the trial court granted Hatchard's discovery request for the production of "outtakes" [1] but expressly excluded from discovery "any material where another source is revealed or where the material contains information which could reasonably lead to the disclosure of another source by the primary source...."

In the other matter before this Court, appellant Lefkoski filed suit alleging that he was defamed by an NEP Communications, Inc. ("NEP") news broadcast that conveyed the view that his auto repair business had engaged in questionable practices. Lefkoski submitted a discovery request for a wide range of documentary material [2] that might contain

---

1. Outtakes are films prepared for a television broadcast but not actually shown in the broadcast. *See* Webster's New World Dictionary (2d Coll. ed. 1982) at 1101.

2. Mr. Lefkoski's motion, as quoted in the majority opinion of the Superior Court, requested discovery of the following:

    1. All writings, photographs, tapes, films, scripts, sound reproductions, records, editorial records, and other compilations of data of, concerning or relating in any way to the following:
    a. Any investigation or investigations made by the defendant concerning the plaintiff and/or plaintiff's business, known as Ziggy's South Wilkes-Barre Auto Body Shop, Rear 611 South Main Street, Wilkes-Barre, PA 1870 [sic].

information that was available to NEP at the time that it broadcast the alleged defamatory news report. NEP took the position that it was privileged to withhold all documentary material except the materials that were actually broadcast. The trial court granted Lefkoski's Motion to Compel Production of the requested material.

Both orders were appealed[3] to the Superior Court, and the two appeals were consolidated for argument and decision. That court, sitting *en banc*, held that the documents in question were not discoverable. *Hatchard v. Westinghouse Broadcasting Company*, 350 Pa.Super. 1, 504 A.2d 211 (1986). Then–President Judge Spaeth, writing for the majority, expressed the view that this broad interpretation of the Shield Law was compelled by this Court's decision in *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), where we interpreted the Shield Law's protection of the "source" of media information as including documents as well as persons. The majority of the Superior Court insisted that it would have interpreted the Shield Law more narrowly if it had felt free to do so, and that based on a narrower

b. Any information which on or before May 29, 1984 became known to the defendant concerning the plaintiff and/or plaintiff's said business.

c. The interview conducted on or about May 23, 1984 by agents and/or employees of the defendant with the plaintiff at the aforesaid place of business of the plaintiff.

d. The complete television news broadcasts transmitted by the defendant on May 28, 1984 and May 29, 1984 and in which the said broadcasts included any reference whatever to the paintiff and/or plaintiff's said business.

e. The anchor-intro to the aforesaid television news broadcasts.

f. The teases to the aforesaid television news broadcasts.

g. All matters edited from and/or omitted from the final form of the aforesaid interview and television news broadcasts.

350 Pa.Super. 1, 8–9, 504 A.2d 211, 214 (1986).

3. In the *Hatchard* matter the trial court refused to certify its order as involving a controlling question of law as to which there is substantial ground for difference of opinion, Pa.R.A.P. 1311, the predicate for an interlocutory appeal by permission. KYW therefore filed a Petition for a Writ of Prohibition or Mandamus in the Superior Court. That court treated KYW's Petition as a petition for review, which it granted. In the *Lefkoski* appeal, the trial court did certify its order pursuant to Pa.R.A.P. 1311 and the Superior Court granted NEP's petition to permit an interlocutory appeal.

interpretation it would have affirmed the trial courts' rulings to the extent that they allowed the discovery of information that would not disclose a confidential media-informant.

The majority opinion in the Superior Court provoked several vigorous dissenting opinions.[4] The dissenters believed that the Superior Court was not bound by *In re Taylor, supra,* because that case involved a request for documents for use in connection with a grand jury proceeding and thus did not address the scope of discoverable information in a libel action. In addition, the dissenters noted—as did the majority—the significant changes in the law of defamation mandated by the United States Supreme Court's interpretation of First Amendment requirements. In light of these radical changes in the standards for recovery in defamation actions, the dissenters believed that *In re Taylor* could no longer be viewed as good law.

This Court granted the plaintiffs' petitions for allowance of appeal, assuming jurisdiction pursuant to 42 Pa.C.S. § 724(a) and Rule 1112 of the Pennsylvania Rules of Appellate Procedure. Since the appeals present the common question of the scope of the privilege from discovery afforded to television stations when they are sued in defamation actions, we consolidated these appeals for argument and disposition.

The Shield Law provides in relevant part:

> No person ... employed by any ... television station ... for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit. 42 Pa.C.S. § 5942(a)

The defendant-appellees contend that the Shield Law affords television stations an absolute and complete protective shield against efforts to discover the "source" of any infor-

---

4. Judge Wieand filed a dissenting opinion which was joined by Judges Rowley and Cirillo. Judges Cirillo and Tamilia also filed dissenting opinions.

mation obtained while it was in the process of preparing for or broadcasting a news story. The appellants take the position that the privilege afforded by the Shield Law is limited to the protection against the production of information that could lead to the disclosure of the identity of a confidential news informant.

The question presented in the instant appeals is basically one of statutory interpretation. The object of such interpretation is, of course, to ascertain the legislature's intent in enacting the statute. 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

It is evident, however, that the term "source" as used in the Shield Law does not have a plain meaning that resolves the present controversy. In *In re Taylor* we held that the term "source" included inanimate objects such as documents as well as persons. We adhere to that view in the present cases.

However, the present cases present an issue which goes far beyond the one presented in *In re Taylor*, namely, whether the use of the term "source" in the context of the statute reflects a legislative intention to protect *all* documentary information from discovery by a plaintiff in a defamation action, regardless of whether the documentary information could reveal a confidential media-informant. That issue is especially significant because the "constitutionalization" of defamation law since *In re Taylor* has made it unmistakably clear that an affirmative answer to the question will immunize many individuals who maliciously or negligently publish false and defamatory statements about others from any legal responsibility for the serious harm caused to the reputation of the targeted individuals.

The constitutionalization of defamation law began, of course, with the United States Supreme Court's decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in which it was established that the First Amendment, made applicable to the states

through the Fourteenth Amendment, required a privilege of fair comment and honest mistake of fact and thus a public official could not recover damages for a defamatory falsehood relating to his official conduct absent proof that the statement was made with "actual malice," *i.e.*, that it was made with knowledge of its falsity or with reckless disregard for whether it was false or not. *Id.* at 279–280, 84 S.Ct. at 725–26. The *New York Times* rule was extended to include non-governmental public figures in 1967. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court addressed the limitations imposed on recovery for defamation by the First Amendment in the context of a private individual subjected to media coverage. The *Gertz* Court held that "The States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to the private individual" provided that liability was not imposed without fault. *Id.* at 347, 94 S.Ct. at 3010. That rule struck a balance between First Amendment concerns and the "strong and legitimate state interest in compensating private individuals for injury to reputation," *id.* at 348, 94 S.Ct. at 3011, by requiring a lesser showing than actual malice in the case of a private individual and at the same time shielding the media from the rigors of strict liability. In one of the most recent developments in the constitutionalization process, the Supreme Court has held that the First Amendment precludes a state from imposing on a media defendant the burden of proving the truth of a defamatory statement; proof of falsity thus became an additional element of the plaintiff's case. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

One decision of the United States Supreme Court which runs counter to the trend of protecting the media at the expense of the defamed individual is particularly significant in the context of the instant appeals. In *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), that

Court, recognizing the need to mitigate the effect of *New York Times* and its progeny, held that the First Amendment did not bar a plaintiff from inquiring into the editorial processes of the media defendant responsible for the publication of a defamatory statement. Thus, in attempting to shoulder the heavy burden of demonstrating "actual malice," the plaintiff was entitled to discovery of the information available to the media defendant at the time of the defamatory publication to permit a meaningful inquiry into whether the statement was maliciously or recklessly made. If we were to embrace the broad interpretation of the Shield Law urged by appellees, even the *Herbert* Court's rare concession to the defamation plaintiff would be negated. If unpublished information which would not reveal confidential sources could be withheld by the media defendant, it would be virtually impossible for the plaintiff to arrive at those facts of which the defendant was aware at the time of publication other than the defamatory information actually disseminated to the public.

The immediate question before the court is whether the legislature has evidenced an intention to go so far as to preclude disclosure of all information in the possession of a media defendant in order to encourage a free flow of information to the news media. In light of the barriers to recovery already imposed by the First Amendment, if that question is answered in the affirmative, we must then face the issue of whether such an extreme exercise of legislative power to protect freedom of expression is compatible with the protection of other fundamental values protected by the Pennsylvania Constitution such as an individual's reputation.

It is obvious that in some instances documentary information can be disclosed to a plaintiff in a libel action without revealing the identity of the person who conveyed the information to the defendant in confidence. In other instances, the nature of the documentary information or the circumstances of its acquisition would render disclosure of the information impossible without a disclosure of the per-

son who conveyed it. Our task in ascertaining the legislative intent in the Shield Law is to determine how broad a shield the legislature intended to erect between an alleged defamer and its victim. We must therefore determine whether the legislature intended to shield from scrutiny *all* information that an alleged defamer had available to it prior to the publication of the defamatory statement, or only that information that could reveal a confidential informant.

Since the legislature's intent in this regard cannot be ascertained from a plain reading of the words in the Shield Law, we look to statutory purpose for guidance. The obvious purpose of the Shield Law is to maintain a free flow of information to members of the news media. *See, e.g., In re Taylor, supra* 412 Pa. at 41, 193 A.2d at 185. We fail to see how this purpose is promoted by protecting from discovery documentary information that was in the possession of the publisher of the defamatory statement where disclosure of this information would not reveal the identity of a confidential media-informant. While there may be some who would only share information with the media if the media enjoyed an absolute shield from any discovery in civil proceedings, providing an absolute shield could hardly be said to be necessary to effectuate the purpose of the Shield Law in light of the information that flows freely in states that have enacted more carefully-tailored shield laws and the considerable burden of proof imposed on a defamation plaintiff by the requirements of the First Amendment. We see no apparent reason why the objective of promoting the free flow of information to the media would be defeated so long as any documentary information that could lead to the discovery of the identity of a confidential informant is shielded from disclosure.

We do not believe the legislature has evinced any intention to make it close to impossible for individuals to seek redress against the media for maliciously or negligently publishing false statements that seriously damage the reputations of individuals. Such a result would follow if we interpreted the Shield Law as broadly as appellees urge

because of the changes in the law of defamation since *In re Taylor* was decided, and would run afoul of the principle of statutory construction that the legislature must be presumed not to intend a result that is absurd, impossible of execution or unreasonable. 1 Pa.C.S. § 1922(1).

More significantly, however, in interpreting the statute in question we must presume that the legislature did not intend to violate the Constitution of the United States or of this Commonwealth. 1 Pa.C.S. § 1922(3). Were we to interpret the Shield Law's protection as broadly as appellees urge, serious questions would arise as to the constitutionality of the statute in light of the protection of fundamental rights provided for in the Pennsylvania Constitution. The Pennsylvania Constitution expressly identifies reputation as one of the fundamental interests that cannot be abridged by the legislature. Article I, section 1 of the Pennsylvania Constitution provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and *protecting* property and *reputation,* and of pursuing their own happiness. Pa. Const. Art. I, § 1 (emphasis added).

In addition, Article I, section 11 explicitly mandates that a legal remedy be available for injuries to reputation:

> All courts shall be open; and *every man for an injury done him* in his lands, goods, person or *reputation shall have remedy by due course of law and right and justice administered without sale, denial or delay.* Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct. Pa.Const. Art. I, § 11 (emphasis added).

This Court has acknowledged previously that the Pennsylvania Constitution establishes reputation as one of the fundamental rights that cannot be abridged without compliance with state constitutional standards of due process and equal protection. *See Wolfe v. Beal,* 477 Pa. 477, 384 A.2d 1187 (1978) (individual committed to state mental hospital in

violation of due process rights entitled to destruction of hospital records to protect reputation); *Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975) (exception in survival action for causes of action for libel and slander is arbitrary and thus violative of equal protection rights afforded under the state constitution for the protection of a fundamental right such as reputation). In fact, we have recognized that our Declaration of Rights places reputation "in the same class with life, liberty and property." *Meas v. Johnson*, 185 Pa. 12, 19, 39 A. 562, 563 (1898).

Indeed, it was this Court's recognition of special value placed on an individual's reputation in the Pennsylvania Constitution that buttressed this Court's view that defamatory statements should be presumed to be false with the burden being placed on the defendant to prove otherwise. *See Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), *rev'd.*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Since the presumption of falsity may no longer be invoked in a defamation action in light of the United States Supreme Court's reversal of our decision in *Hepps*, were we to interpret the Shield Law as broadly as the Superior Court we would face serious questions regarding the compatibility of the Shield Law and Article 1, Sections 1 and 11 of the Pennsylvania Constitution.

Under standards mandated by the federal constitution, a plaintiff who claims harm to a fundamental interest protected by the Pennsylvania Constitution would face the burden of proving that a defamatory statement was maliciously or negligently published and that the statement was false. On the other hand, the media defendant who is alleged to be a malicious or negligent defamer would have carte blanche to withhold from judicial scrutiny any documentary information in his possession that it did not voluntarily publish. It is difficult to see how any "fundamental interest" protected by our State Constitution could survive such a legal scheme. Citizens of the Commonwealth of Pennsylvania would in effect hold a fundamental right protected by the State Constitution; yet when the fundamental right was seriously

damaged the courts could offer a meaningful remedy in only the rarest of cases. We decline to impute such an intention to the legislature. We therefore conclude that, to the extent that language in *In re Taylor* may be read as interpreting the Shield Law to protect from discovery, in defamation actions, documentary material that could not reasonably lead to the discovery of the identity of a confidential media-informant, that decision interpreted the Shield Law much too broadly. Given the present state of First Amendment jurisprudence, such an interpretation would not adequately protect the fundamental right of reputation guaranteed to the citizens of this Commonwealth. We therefore hold that unpublished documentary information gathered by a television station is discoverable by a plaintiff in a libel action to the extent that the documentary information does not reveal the identity of a personal source of information or may be redacted to eliminate the revelation of a personal source of information. Since the trial court order allowing discovery in *Hatchard* was limited to information that could not reasonably lead to the discovery of the identity of personal sources of information, the Superior Court's order disallowing such discovery must be reversed. Since the trial court's order in *Lefkoski* was not limited expressly in this manner, the Superior Court's order disallowing all of the requested discovery must be reversed and the cause remanded to the trial court for the entry of an order consistent with this opinion.

Accordingly, the orders of the Superior Court are reversed and the matters are remanded to the respective trial courts. The order entered by the trial court compelling discovery in *Hatchard* is reinstated. The order entered by the trial court in *Lefkoski* is reinstated subject to modification consistent with this opinion.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of these cases.

HUTCHINSON, J., concurs in the result.