Kenneth E. DAVIS, James S. Ettelson, Alan C. Kessler, Frank Lutz, Joseph M. Manko, Ora R. Pierce, James J. Prendergast, Brian D. Rosenthal, David A. Sonenshein, Howard L. West, Gloria P. Wolek, and Phyllis L. Zemble, Appellees,

v.

Richard GLANTON, Individually and as a Trustee of the Barnes Foundation, Niara Sudarkasa, Individually and as a Trustee of the Barnes Foundation, Shirley A. Jackson, Individually and as a Trustee of the Barnes Foundation, Charles Frank, Individually and as a Trustee of the Barnes Foundation.

**Appeal of Kyle York SPENCER and the Philadelphia Inquirer.**

Superior Court of Pennsylvania.

Argued April 10, 1997.

Filed Dec. 23, 1997.

Robert C. Heim, Philadelphia, for appellants.

Robert J. Sugarman, Philadelphia, for Glanton and Sudarkasa, appellees.

Larry R. Wood, Jr., Philadelphia, for Davis, Ettelson, Kessler, Lutz, Manko, Pierce, Prendergast, Rosenthal, Sonenshein, West, Wolek and Zemble, appellees.

Before BECK, SAYLOR and MONTEMURO*, JJ.

BECK, Judge:

We address the application of the Pennsylvania Shield Law and the qualified privilege of the First Amendment of the United States Constitution to a subpoena issued to a nonparty newspaper by plaintiffs in a defamation suit.

---

* Retired Justice assigned to Superior Court.

1. Paragraphs 2, 3, and 4 of the subpoena sought materials in the possession of not only the Philadelphia Inquirer, but also the Philadelphia Daily News. The trial court quashed the subpoena inso-

The Philadelphia Inquirer and one of its reporters, Kyle York Spencer (collectively, "Inquirer") appeal the trial court order requiring them under a subpoena to turn over certain materials to the plaintiffs, the Commissioners of Lower Merion Township ("plaintiffs" or "Commissioners"). The underlying action for defamation was brought by the Commissioners against defendants Richard Glanton, Niara Sudarkasa, Shirley A. Jackson, and Charles Frank, individually and as trustees of the Barnes Foundation. Defendants are responsible for the operation of the Barnes Foundation, which is located in Lower Merion Township.

The Commissioners' subpoena related to: 1) material used for an article published in the Inquirer on November 27, 1995; 2) other Inquirer articles or editorials from January 1990 to the present mentioning the defendants, the Barnes Foundation Board of Trustees, or the Barnes Foundation (collectively, "Barnes entities"); 3) notes taken from January 1990 to present by reporters in connection with any interviews or discussions with defendants or their representatives; and 4) documents from January 1990 to present "including but not limited to press releases, wire service stories, and other materials or information" received by the Inquirer in connection with articles and/or editorials involving the Barnes entities.[1]

Broadly stated, the subpoena called for the Inquirer to divulge information and materials gathered or prepared in connection with a specific article published November 27, 1995 and more generally for information and materials relating to the Barnes entities in the Inquirer's possession from January 1990 to the present.

In opposing the subpoena, the Inquirer relied on privileges arising under The Pennsylvania Shield Law and the First Amendment.

far as it requested materials from the Daily News, since the subpoena was not directed to that newspaper. That ruling has not been questioned in this appeal.

### Issues Raised

This appeal raises several issues pertaining to the journalist's privilege not to disclose sources of the information contained in published articles and reports. We first consider whether in a defamation action a media entity which is not a party to the action is required under the Pennsylvania Shield Law, 42 Pa.C.S. § 5942, to produce reporters' notes and other unpublished materials pertaining to conversations with a disclosed source. We conclude, based on the decision of the Pennsylvania Supreme Court in *Hatchard v. Westinghouse Broadcasting*, 516 Pa. 184, 532 A.2d 346 (1987), that to the extent such materials cannot reasonably lead to the identification of sources not revealed in published articles they are not protected.

The appeal also raises questions as to whether the subpoenaed materials are protected by the qualified privilege protecting journalists' sources under the First Amendment of the United States Constitution. With respect to the materials relating to the November 27, 1995 newspaper article reporting the remarks which are the subject of plaintiffs' defamation action, we conclude that plaintiffs have made the showing necessary to overcome the qualified privilege. With respect to other privileged materials covered by the subpoena, however, we cannot agree with the trial court that plaintiffs have overcome the qualified privilege. Accordingly, we affirm in part, reverse in part and modify in part the trial court's order.[2]

### Background

Among the allegations in the defamation suit is the claim that defendant Richard Glanton falsely accused plaintiffs of engaging in "thinly disguised racism," as reported in an Inquirer article entitled "An Enduring Tension part of Barnes Legacy," written by Kyle York Spencer and published on November 27, 1995. The article included the following passage, containing the specific statements by Glanton focused upon in the complaint:

> Glanton is having his own fights with the township government. In October, the commissioners did not go along with Glanton's request that approval of a new parking lot for the museum be expedited. Glanton responded by saying the tax-exempt foundation would no longer make voluntary payments in lieu of taxes for "those bureaucrats to jerk me around."
>
> He has been assailed by neighbors such as Robert Marmon, who call him and the Barnes Foundation's board "interlopers," "outsiders" and "carpetbaggers." Those neighbors showed up at a Lower Merion Board of Commissioners meeting two weeks ago, on the eve of the museum's Nov. 16 reopening, complaining about fears of chaos, traffic, pollution and crowds.
>
> The Commissioners passed a symbolic resolution asking the foundation to postpone the opening until it addressed the crowd-control issue. Glanton rejected the request, called it "disappointing," and criticized the commissioners for heeding the concerns of what he characterized as a small group of residents.
>
> In Barnes' day, as now, things got personal.
>
> In 1927, a local newspaper called the Mainliner published a cartoon showing him walking down a street in his bathrobe with a black toddler by his side. That year, an anonymous note from a neighbor to Barnes, who made his fortune from patent medicine, referred to him as a "clap doctor" and "a nigger lover."
>
> No such language is used these days. But Glanton argues that there is more to the current opposition than concern about art, traffic or pollution. It's an expression of a "thinly disguised racism," he contends.
>
> "There is no way you cannot see racism in the way they are treating the Barnes

2. Inquirer also asserts that the trial court erred in declining to enforce an alleged agreement between the plaintiffs and appellants limiting the scope of the subpoena. The parties do not agree as to the substance of this alleged agreement or its intended effect, and the certified record is devoid of information supporting Inquirer's argument. We thus must conclude that appellants have failed to make out a claim cognizable on appeal. *See Frank v. Frank*, 402 Pa.Super. 458, 463 n. 5, 587 A.2d 340, 342–43 n. 5 (1991) ("For purposes of appellate review, what is not of record does not exist.")

Foundation," Glanton, who is black, said in a recent interview.

Kyle Spencer, "An Enduring Tension part of Barnes Legacy" *Philadelphia Inquirer,* Nov. 27, 1995 at N4.

### *The Pennsylvania Shield Law*

■ Because the Pennsylvania Shield Law creates an absolute privilege which, if applicable to the information sought in this case, would protect it from disclosure without analysis of plaintiffs' need for the information, we first address the Inquirer's claim that the materials sought by the subpoena are protected by the Shield Law. That statute provides, in pertinent part:

(a) **General rule.**——No person engaged on, connected with, or employed by any newspaper of general circulation ... for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S. § 5942(a). Relying on the decision of the Pennsylvania Supreme Court in *In re Taylor and Selby Appeals,* 412 Pa. 32, 193 A.2d 181 (1963), Inquirer argues that this statutory provision protects all information gathered by a reporter except that for which the privilege has been waived by actual publication or public disclosure, regardless of whether the identity of the individual who provided the published information is disclosed.

*In re Taylor, supra,* was the appeal of two Philadelphia *Evening Bulletin* reporters from contempt orders entered when they refused to comply with grand jury subpoenas *duces tecum.* The subpoenas sought all tape recordings, written statements, and memoranda of interviews, conversations, and conferences the reporters had with John Fitzpatrick, a subject of the grand jury investigation. The contempt court held that the Shield Law[3] protects only the identity of persons and not inanimate materials and

that because a published article had disclosed that Fitzpatrick had spoken with reporters, the privilege created by the Shield Law was waived as to Fitzpatrick. It therefore ruled that the reporters were required to disclose all of the material evidencing what Fitzpatrick had told the Bulletin, with names deleted to avoid disclosure of any other sources. The supreme court disagreed, holding that the clear meaning of the word "source" as used in the statute was "not only the identity of the person, *but likewise ... documents,* inanimate objects, *and all sources of information." Id.* at 40, 193 A.2d at 185 (emphasis in original). It went on to reason that although the primary source of the information had been revealed in the newspaper article and the materials were to be produced with names deleted, "no one could know with certainty whether the documents as deleted by the newsman would still reveal sources of information which the [Shield Law] intended to protect." *Id.* at 43, 193 A.2d at 186. Accordingly, the supreme court stated:

If a Court can select or direct newsmen in its or their judgment to select or delete what information is disclosed by the informer or to furnish the documents in full with only the names deleted which the newsman or the Court sincerely believes should be deleted, the purpose, the object and the intent of the Act will be *realistically* nullified. We therefore hold that a waiver by a newsman applies only to the statements made by the informer which are actually published or publicly disclosed and not to other statements made by the informer to the newspaper.

*Id.* at 43–44, 193 A.2d at 186.

Based on the *In re Taylor* court's interpretation of the Shield Law, the Inquirer argues that the trial court in this case erred as a matter of law in requiring the production of reporters' notes and other unpublished material gathered in the preparation of the November 27 article and other articles mentioning the Barnes entities.

---

**3.** At the time of the decision in *In re Taylor, supra,* an earlier version of the Law was in effect, Act of June 25, 1937, (P.L. 2123)(No. 433), § 1, *as amended,* 1959, Dec. 1, P.L. 1669 § 1 (28 P.S.

§ 330). For purposes of our analysis of the present case, the provisions of the prior Shield Law are functionally identical to those of the present law.

The Inquirer's argument might be persuasive if *In re Taylor* were the final statement of our supreme court on the interpretation and application of the Shield Law. However, in *Hatchard v. Westinghouse Broadcasting,* 516 Pa. 184, 532 A.2d 346 (1987), the supreme court took a second look at the scope of protection afforded by the Shield Law in the particular context of defamation actions and determined that *In re Taylor's* interpretation of the Shield Law was too broad to be applied in such cases.

*Hatchard* arose out of two libel actions, consolidated on appeal, against local television stations and their parent broadcasting companies for news broadcasts that allegedly defamed the plaintiffs. In one case, plaintiffs attempted to discover "out-takes" (video prepared for a television broadcast but not actually shown in the broadcast). In the other, plaintiffs sought discovery of documentary materials available to the station at the time that it broadcast the allegedly defamatory report.

In considering whether the respective trial courts had erred in allowing limited discovery of such information, the Pennsylvania Supreme Court adhered to the view it had taken in *In re Taylor, supra,* that the term "source" as used in the Shield Law includes inanimate objects, such as documents, as well as persons. However, the court held that *In re Taylor* had not decided the broader question of whether in enacting the Shield Law[4] the legislature intended to protect *all* unpublished documentary information, regardless of whether it could reveal a confidential media-informant. *Id.* at 189, 532 A.2d at 348.

In deciding that broader issue, the *Hatchard* court reviewed the effects upon plaintiffs of the U.S. Supreme Court's "constitutionalization" of defamation law in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. The court concluded that in light of the barriers to recovery presented to defamation plaintiffs by the First Amendment, an interpretation of the Shield Law to preclude disclosure

of all unpublished information in the possession of a media defendant would run afoul of the Pennsylvania Constitution's protection of reputation, embodied in Article I, section 1. The court noted that such broad protection of journalists' documentary materials was not always necessary because although in some cases, "the nature of the documentary information or the circumstances of its acquisition would render disclosure of the information impossible without a disclosure of the person who conveyed it", in other instances, "documentary information can be disclosed ... without revealing the identity of the person who conveyed the information to the defendant in confidence." *Id.* at 191–92, 532 A.2d at 349. The court therefore held that "unpublished documentary information ... is discoverable by a plaintiff in a libel action to the extent that the documentary evidence does not reveal the identity of a personal source of information or may be redacted to eliminate the revelation of a personal source of information." *Id.* at 195, 532 A.2d at 351.

Inquirer argues that *Hatchard* addressed the interpretation of the Shield Law only where the media entity asserting the privilege is the defendant in the defamation action, and thus that it does not apply in the instant case, where Inquirer is not a party to the underlying action, but only a recipient of a subpoena. Although it is true that in *Hatchard* the television stations seeking the protection of the Shield Law were defendants in the defamation actions, it does not follow that *Hatchard* should be read as narrowly as Inquirer would have us do. Regardless of whether the defendant in the defamation action is the media entity itself or some other person, the public figure plaintiff faces the same hurdle: the burden of proving that a defamatory statement was maliciously published and that the statement was false. If the media are permitted to withhold information that is relevant to this burden, whether or not the media are themselves the defendants, the obstacles placed in the way of a plaintiff in attempting to vindicate his constitutionally protected interest in his reputation

---

4.  The version of the Shield Law considered in *In re Taylor,* codified at 28 P.S. § 330, had been repealed and substantially reenacted in the current law at 42 Pa.C.S. § 5942 in the period between the decision in *In re Taylor* and the Pennsylvania Supreme Court's consideration of *Hatchard.* This repeal and reenactment were not material to the decision in *Hatchard.*

are rendered almost insurmountable. *Hatchard* instructs that if the information in the possession of the media could not reasonably lead to the discovery of the identity of a confidential media-informant, such obstacles are not justified by the countervailing interest in encouraging free exchange of ideas and thus are not sanctioned by the Shield Law. We can see no reason, and Inquirer offers none, why the rationale of *Hatchard* is not equally applicable in cases where materials relevant to plaintiff's burden are in the possession of a media entity which is not a party.

■ Accordingly, we hold that, under the principles enunciated in *Hatchard*, the Shield Law does not excuse Inquirer from production of subpoenaed materials which cannot reasonably lead to the discovery of the identity of a confidential media-informant or which can be redacted to eliminate the revelation of such a source of information. In the present case, the trial court ordered Inquirer to release all material pertaining to conversations with disclosed sources. Under the principles set forth in *Hatchard*, the Shield Law permits such disclosure only if the material cannot reasonably lead to the discovery of the identity of another, undisclosed source, or can be redacted to prevent such revelation. The trial court's order will be modified accordingly.[5]

### The First Amendment Privilege

■ Inquirer also asserts that the trial court's order is violative of the qualified First Amendment privilege protecting members of the news media from divulging their sources, including unpublished information. *See United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir.1980); *Riley v. City of Chester*, 612 F.2d 708, 714–15 (3d Cir.1979). This privilege, designed to protect freedom of the press by insuring a free flow of information to reporters, will be overcome only where a demonstrated, specific need for evidence presents a paramount interest to which the privilege must yield. *Riley v. City of Chester, supra* at 715–16 (citing *United States v. Nixon*, 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974)). The determination of whether the privilege has been overcome must be made on a case-by-case basis, balancing the rights of reporters under the First Amendment against the interests of those seeking the information the reporters possess. *Id.; McMenamin v. Tartaglione*, 139 Pa.Cmwlth. 269, 287, 590 A.2d 802, 811 (1991). This balancing of interests will tip in favor of disclosure of information where: 1) the information sought is material, relevant and necessary; 2) there is a strong showing that it cannot be obtained by alternative means, and 3) the information is crucial to the plaintiff's case. *Riley v. City of Chester, supra* at 716–17; *McMenamin v. Tartaglione, supra*.

■ Applying these standards, the trial court found that Glanton's allegedly defamatory statements could be interpreted as referring either to the Commissioners, or to neighbors of the Barnes Foundation and that the Commissioners, as plaintiffs, would therefore be required to prove that the statements referred to them. It reasoned that other statements Glanton may have made to Inquirer reporters about the events recounted in the November 27 article would be relevant, material and necessary to determining whether the remarks referred to the commissioners. We agree that given the ambiguity of the published statement, information as to the context in which it was made is relevant, material, necessary and crucial to plaintiffs' attempt to prove that Glanton defamed them. Moreover, we agree with the trial court that since Glanton's comments were made during an interview with an Inquirer reporter at which no one else was present, the reporter's notes, the only memorialization of the conversation, are the only source of such information and it would

---

5. The trial court's order modifying the subpoena was clearly aimed at protecting the confidentiality of undisclosed sources. However, the language of its order differs subtly from the standard set forth in *Hatchard* and we cannot tell, based on the information now before us, whether that difference could require the production of material which can reasonably lead to discovery of the identity of an undisclosed source, thereby violating the Shield Law as interpreted in *Hatchard*. Accordingly, we must modify the trial court's order to mirror more precisely the standards set forth by the *Hatchard* court.

be futile to seek it elsewhere.[6] Accordingly, we find no error in the trial court's order with respect to the materials relating to the November 27 article requested in paragraph 1 of the subpoena.

However, the trial court also ordered Inquirer to produce reporters' notes in connection with any conversations with the defendants or their representatives from January 1990 to the present (to the extent those notes pertained to conversations with disclosed sources) and any documents received by the Inquirer in connection with any article or editorial involving any Barnes entity from January 1990 to the present. With respect to these materials, requested in paragraphs 3 and 4 of the subpoena, we cannot agree that plaintiffs have made the showing necessary to overcome the journalists' qualified privilege. Paragraphs 3 and 4 of the subpoena encompass *all* notes regarding *any* conversation with *any* of the defendants for more than five years preceding Glanton's allegedly defamatory statements and all documents received in connection with all articles involving a Barnes entity for more than five years preceding Glanton's statement.

The trial court's opinion in support of the order approving the subpoena for these materials reasons that statements Glanton may have made to Inquirer reporters at other times could be relevant in determining whether the remarks reported in the November 27 article referred to the plaintiffs. It further opines that if such materials revealed that Glanton made other allegations of racism, those allegations could be relevant in proving malice. Finally, it notes that even if not directly admissible, the subpoenaed information could assist the plaintiffs in finding witnesses or documents relevant to whether the statements were true or whether they referred to the plaintiffs. Trial Court Opinion at 4–5. It is indeed possible that these rationales might apply to some specific pieces of information in Inquirer's possession. However, plaintiffs must do more than demonstrate a mere possibility that a media enti-

ty possesses relevant information in order to overcome the First Amendment privilege.

Plaintiffs have not made a specific showing that the broad disclosure requested by paragraphs 3 and 4 of the subpoena is material, relevant and necessary to their case. The rationales advanced by plaintiffs and accepted by the trial court are simply too speculative to warrant the chilling effect on First Amendment freedoms that such broad disclosure has the potential to cause. Although it is beyond dispute that a showing of actual malice is crucial to plaintiffs' case, their speculative justification for release of the subpoenaed information fails to demonstrate that production of the requested materials is the only way in which that crucial element can be proven. Moreover, the trial court's discussion of the unavailability of information from other sources pertains only to notes regarding the interview reported in the November 27 article (the materials requested in paragraph 1 of the subpoena) and makes no finding that the materials enumerated in paragraphs 3 and 4 of the subpoena cannot be obtained from a source other than the Inquirer. As the record does not establish that other conversations with defendants took place without witnesses, or that the reporters' notes and documents are the only memorialization of such conversations, we cannot mechanically extend the finding of unavailability made with respect to notes of the Glanton interview reported in the November 27 article to the other materials sought by the subpoena.

Accordingly we must conclude that with respect to paragraphs 3 and 4 of the subpoena, the record falls far short of establishing the "demonstrated, specific need for evidence" which is required in order to overcome a privilege grounded in constitutional policy. *Riley v. City of Chester, supra* at 716 (quoting *U.S. v. Nixon, supra* ) (conclusory statements by trial court fall short of the type of specific findings of necessity which may overcome the privilege). The trial court erred as a matter of law in concluding that

---

**6.** When Glanton was deposed by plaintiffs, he denied having made the reported comments in the context in which they were presented and stated that the reporter had taken a hypothetical posed by Glanton and "lifted it into her own language." Deposition of Richard H. Glanton, 8/1/96, at 466–68 (R.R. 89a).

the Inquirer's qualified privilege in the material requested in paragraphs 3 and 4 of the subpoena was overcome and therefore abused its discretion in refusing to quash those paragraphs of the subpoena.

■ Paragraph 2 of the subpoena remains to be addressed. That paragraph requested published articles and editorials mentioning Barnes entities. Published materials are neither protected by the Shield Law nor privileged under the First Amendment. On appeal, Inquirer has not asserted any other basis (such as unreasonable annoyance, embarrassment, oppression, burden or expense, *see* Pa.R.C.P. 234.4) for reversing the trial court's order refusing to quash the subpoena. Accordingly, we find no abuse of discretion in the trial court's order refusing to quash paragraph 2 of the subpoena.

### Conclusion

For the reasons discussed above, we affirm the order of the trial court insofar as it pertains to paragraph 2 of the subpoena. We reverse the order of the trial court insofar as it pertains to paragraphs 3 and 4 of the subpoena. We modify the order of the trial court insofar as it pertains to paragraph 1 of the subpoena to direct that Kyle York Spencer and/or *The Philadelphia Inquirer* shall produce all information sought by that paragraph which cannot reasonably lead to the discovery of the identity of a confidential informant, or which can be redacted to eliminate the revelation of a confidential source of information.

Order affirmed in part; reversed in part; modified in part.