COMMONWEALTH OF
PENNSYLVANIA,
Appellee,

v.

Brian TYSON, Appellee.

Appeal of Mark BOWDEN
Pennsylvania Newspaper
Assoc.

Appeal of Linn Washington, Jr.

Commonwealth of Pennsylvania,
Appellee,

v.

Mark Bowden and Linn Washington,
Jr., Appellants.

Superior Court of Pennsylvania.

Argued Sept. 25, 2001.
Filed May 29, 2002.

Robert C. Heim, Philadelphia, for Bowden, appellant.

Karen A. Brancheau, Asst. Dist. Atty., Philadelphia, for Commonwealth, appellee.

Before: HUDOCK, STEVENS, and OLSZEWSKI, JJ.

OLSZEWSKI, J.

¶ 1 Mark Bowden and Linn Washington, Jr. appeal from the December 13, 2000, order entered by the Court of Common Pleas of Philadelphia County. This order held appellants in contempt for failing to comply with the court's December 4, 2000, order, which required them to produce a defendant's verbatim statements prior to his criminal trial. As a result, the court ordered them to "pay $100 per minute starting 12:00 noon [on December 13, 2000] until compliance or until the Commonwealth finally rests its case on rebuttal."

Order, 12/13/00. After thorough review, we affirm.

¶ 2 The two orders issued by the lower court and the instant appeal therefrom arise from the underlying criminal case against Brian Tyson. *See Commonwealth v. Tyson*, Philadelphia County, No. 9710–0014. On the evening of September 23, 1997, Brian Tyson emerged from an alley in his Feltonville neighborhood and shot Damon Millner, a local drug dealer, killing him. Tyson was arrested later that night and charged with first-degree murder. While he admitted killing Millner, he told police that the victim and several other drug dealers were after him and that he shot him in self-defense.

¶ 3 Before he was tried for Millner's murder, Tyson met with appellants Bowden and Washington, reporters for the Philadelphia Inquirer and Philadelphia Tribune respectively, and allowed them to interview him. He provided the reporters with details of the shooting and the problems drug dealers brought to his neighborhood. Tyson stated that he tried to rid his neighborhood of drugs and that at the time of the shooting, he had been in a two-year feud with local drug dealers. Both newspapers published a series of articles setting forth his account of the shooting and the circumstances surrounding it.

¶ 4 The Commonwealth reviewed these articles and found a number of inconsistencies with respect to the events leading up to the shooting, the number of shots Tyson fired, the exact location of the shooting, and most importantly, the reason he shot Millner. As a result, it subpoenaed appellants to testify at Tyson's trial concerning unpublished statements he made during the interview. On October 24, 2000, the Commonwealth also issued subpoenas *duces tecum* requiring appellants to turn over "all handwritten or otherwise memorialized notes of interviews or phone con-

versations with Brian Tyson." Subpoenas *Duces Tecum*, 10/24/00.

¶ 5 Appellants moved to quash these subpoenas on November 29, 2000, two days before the trial was originally scheduled to begin. They argued that their unpublished interview notes were privileged under both the First Amendment and the Pennsylvania Shield Law. The trial court held a hearing, and on December 4, 2000, it granted the motions to quash in part and denied them in part.

¶ 6 The court initially held that the Pennsylvania Shield Law offered no protection because compliance would not expose a confidential source. The court recognized that the reporters possessed a qualified First Amendment privilege in their interview notes, but stated that this privilege did not protect all of Tyson's verbatim statements from disclosure. Therefore, the court did not require appellants to turn over their notes; rather, it ordered them to produce only "verbatim or substantially verbatim statements [Tyson made] involving the incident itself or such statements of the defendant which speak to his relationship to drug dealers in [his] neighborhood." Order, 12/04/00, at 3. The judge later clarified that appellants could either provide these statements orally or list them in writing.

¶ 7 On December 5, 2000, appellants petitioned the lower court for a stay of this order, which was denied. On appeal, this Court granted a temporary stay on December 7, 2000, but later dissolved it. Finally, appellants petitioned our Supreme Court to stay the order, but the Court refused.

¶ 8 While appellants pursued this stay, the Commonwealth presented its case in chief to the jury and finished doing so by the time appellants' petition to the Supreme Court was denied. Appellants still would not produce these verbatim state-ments, and as a result, were in violation of the trial court's order. After giving appellants repeated attempts to comply and offering an *in camera* review of these statements, the trial judge issued an order on December 13, 2000, holding them in contempt and ordering them to pay $100 per minute until they complied or the Commonwealth completed its case on rebuttal. When the trial concluded, each appellant's contempt sanction totaled $40,000.

¶ 9 Appellants filed the instant appeals in which they raise the following issues:

1. Did the trial court err in ordering the reporters to testify or otherwise disclose information, without making the required specific findings of fact, based on an erroneous conclusion that the Commonwealth of Pennsylvania had met its burden of proof under the First Amendment even though there was nothing crucial about the subpoenaed information and there were, in any event, alternative sources of information?

2. Did the trial court err when it ordered the reporters to testify or otherwise disclose unpublished information despite Pennsylvania law establishing that the Pennsylvania Shield Law protects all unpublished information gathered by a reporter, not just non-confidential source information?

3. Did the trial court err when it ordered the reporters to submit to a private "interview" with the prosecutor and disclose their unpublished information informally given that Pennsylvania law provides no authority to a trial court to require a witness to submit to such a procedure?

4. Did the trial court err when it imposed a virtually unprecedented $40,000 contempt sanction against the reporters for respectfully declining to be

interviewed by the prosecutor or to testify about unpublished information based on their invocation of the Pennsylvania Shield Law and the First Amendment reporters' privilege?

Appellants' Brief at 6.

 ¶ 10 In reviewing a contempt order, this Court must ensure that the trial court correctly applied the law in reaching its findings and did not abuse its discretion. *Holderman v. Hagner*, 760 A.2d 1189, 1192 (Pa.Super.2000). We will only reverse where the trial court "misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record shows that [its] decision is a result of partiality, prejudice, bias, or ill will." *Id.*

 ¶ 11 The enforceability of the lower court's contempt sanction rests not only on the legality of the order itself, but also on the legality of the underlying order compelling appellants to disclose Tyson's unpublished statements. Therefore, we begin by analyzing the constitutionality of the December 4, 2000, order under the First Amendment.

 ¶ 12 As a general rule, individuals possess no "constitutional[ ] immun[ity] from ... subpoenas" and other requests for pre-trial discovery. *Branzburg v. Hayes*, 408 U.S. 665, 682, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Parties to both civil litigation and criminal trials have an important interest in obtaining "every man's evidence" and when called upon, citizens must provide whatever information they are "capable of giving." *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). Where, in the course of investigating a story, however, a journalist receives information from a confidential source, he possesses a qualified First Amendment privilege that may shield the disclosure of that evidence. *Branzburg*, 408 U.S. at 700, 92 S.Ct. 2646.

¶ 13 In *Branzburg*, the United States Supreme Court consolidated three cases in which reporters were subpoenaed to testify before grand juries about criminal activity they had witnessed in the course of interviewing confidential sources. *Id.* at 667–677, 92 S.Ct. 2646. The reporters moved to quash their respective subpoenas on the grounds that they had an absolute privilege under the First Amendment to protect confidential information and the sources of such information. *Id.* at 669–677, 92 S.Ct. 2646. When this consolidated appeal reached the Supreme Court, a majority of Justices refused to recognize an absolute First Amendment privilege for members of the press, which did not exist for the average citizen. *Id.* at 700, 92 S.Ct. 2646. The Court held that journalists had a qualified testimonial privilege under the First Amendment that did not apply where the State could demonstrate a "compelling" or "paramount" interest in the information. *Id.* (citing *e.g.*, *NAACP v. Button*, 371 U.S. 415, 439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

 ¶ 14 Following *Branzburg*, the Third Circuit joined several other circuits[1] in reading the qualified privilege as extending to protect journalists from compelled discovery. *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir.1980); *United States v. Criden*, 633 F.2d 346, 357–58 (3d Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981). In adopting this qualified privilege, this Court stated that the party seeking disclosure must establish the following to overcome the privilege: (1) it

---

**1.** *E.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595–96 (1st Cir. 1980).

exhausted attempts to obtain the information from other sources; (2) the information sought is "material relevant and necessary;" and (3) the information sought is "crucial" to its case. *Davis v. Glanton*, 705 A.2d 879, 885 (Pa.Super.1997). *See also Criden*, 633 F.2d at 358–59. This standard must be applied on a case-by-case basis in order to balance the interests of a free flow of information with the interests of the moving party, which in this case was the Commonwealth's need to obtain information for a criminal prosecution. *See Davis*, 705 A.2d at 885.

¶ 15 After thoroughly reviewing the record, we conclude that the Commonwealth satisfied these three requirements and overcame appellants' qualified privilege. With respect to the first requirement, these two reporters and Tyson were the only sources of the verbatim statements since they were the only individuals present at the interview. Therefore, the only potential alternative to subpoenaing appellants would have been to try to elicit the information from Tyson.

¶ 16 Initially, we note that the Commonwealth could not compel Tyson to testify and that it subpoenaed appellants before it became aware of his decision to testify. Nevertheless, the Commonwealth cannot be expected to rely on a criminal defendant to provide it with statements on cross-examination that are inconsistent with his direct testimony. If Tyson denied making such statements or modified them to suit his defense, the Commonwealth would be without the actual prior inconsistent statements both for purposes of impeachment and substantive evidence.

¶ 17 Even if Tyson were asked about these statements on cross-examination and if he were completely forthcoming, the Commonwealth would still not likely obtain the specific verbatim statements that would be "useful for impeachment pur-

poses." *See Cuthbertson*, 630 F.2d at 148. As the Third Circuit explained, the verbatim statements a witness makes to a reporter during an interview are "unique bits of evidence that are frozen at a particular place and time." *Id.* Therefore, the only true source of Tyson's statements concerning the shooting and his relationship with drug dealers in the area is the reporters' notes, and it would have been "futile to seek [them] elsewhere." *See Davis*, 705 A.2d at 885–86.

¶ 18 We are further convinced that the Commonwealth adequately demonstrated that "the verbatim or substantially verbatim statements" concerning the shooting and Tyson's relationship to drug dealers in his neighborhood were relevant and crucial to its case against him. At trial, Tyson claimed that he shot the victim in self-defense, thereby making his state of mind during the incident and his credibility extremely important. Therefore, his statements regarding the shooting were directly relevant and crucial to countering his self-defense theory and impeaching his credibility. No other impeachment witness could have had the same effect as the defendant's own prior inconsistent statements.

¶ 19 Tyson's verbatim statements regarding his interactions with drug dealers in the area were similarly crucial to the Commonwealth's case and its effort to counter his defense. Tyson's defense centered on the allegation that the victim was part of a drug gang and that this individual pulled out a gun, threatened him, and shot at him immediately prior to the shooting. In his interview with appellants, however, Tyson made statements regarding his prior interaction with drug dealers and statements that portrayed him as a crusader against drugs in his neighborhood. These verbatim statements were crucial to the Commonwealth's attempt to prove that

he shot the victim deliberately to help rid his neighborhood of drugs and gangs, rather than in self-defense.

¶ 20 Appellants also argue that this underlying order violated the Pennsylvania Shield Law. Specifically, appellants argue that the privilege created by the Shield Law did not permit the trial court to compel the disclosure of Tyson's non-published verbatim statements. We reject the applicability of the Shield Law to this case.

¶ 21 The Pennsylvania Shield Law provides:

> No person engaged on, connected with, or employed by any newspaper of general circulation ... for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S. § 5942(a) (emphasis added). In interpreting this statute, our Supreme Court held that the "source" of information "means not only the identity of the person, but likewise includes documents, inanimate objects and all source[s] of information." *In re Taylor*, 412 Pa. 32, 193 A.2d 181, 185 (1963). In *Taylor*, the district attorney interviewed John J. Fitzpatrick about his knowledge of corruption in the various branches of the City of Philadelphia, and Fitzpatrick later spoke with newspaper reporters about the interview. *Id.* at 182. During a subsequent grand jury investigation, the district attorney sought disclosure of the reporters' notes containing Fitzpatrick's statements. *Id.* When the case reached our Supreme Court, a majority of justices held that even though Fitzpatrick's identity was known, the reporters' notes were a "source" of the information and the Shield Law protected them from disclosure. *Id.* at 185. The Court reasoned that this liberal reading of the

statute was necessary to protect other confidential sources who may have been revealed in the statements. *Id.* at 186.

¶ 22 As this Court stated in *Davis*, *Taylor* does not represent the "final statement of our Supreme Court on the interpretation and application of the Shield Law." 705 A.2d at 884. In *Hatchard v. Westinghouse Broadcasting Co.*, the Supreme Court narrowed the scope of the Shield Law in defamation cases, to protect only those unpublished documents that might reveal a confidential informant. 516 Pa. 184, 532 A.2d 346, 349 (1987). The Court concluded that it did not need to protect all unpublished information in order to encourage a free flow of information. *Hatchard*, 532 A.2d at 349. Instead, it held that where there is no danger of revealing a confidential informant, a defamation plaintiff is entitled to discover unpublished information containing the "facts of which the [media] defendant was aware at the time of publication." *Id.*

¶ 23 Although the instant case does not involve a civil claim of defamation, we find *Hatchard* to be far more illustrative than *Taylor*. Tyson clearly is not a confidential source since the reporters' stories were exclusive features regarding the shooting and his role as an active opponent of drug dealers in the neighborhood. He only spoke to the reporters about his own actions, and therefore, there is also no danger that disclosure of his unpublished statements would reveal any confidential informants.

¶ 24 Therefore, preventing the disclosure of Tyson's unpublished statements would not further the interests underlying the Shield Law. The free flow of information certainly would not be hampered since Tyson answered the reporters' questions knowing that they would form the basis of several published articles. The journalis-

tic judgment of the reporters and their editors was the only reason some of his statements were not published.

¶ 25 On the other hand, the Commonwealth's need for the production of relevant evidence such as the defendant's verbatim statements is an important "constitutional need ... central to the fair adjudication of a particular criminal case in the administration of justice." *United States v. Nixon,* 418 U.S. 683, 712–13, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). This interest is as important as the interest implicated in *Hatchard,* and we are confident that the legislature similarly did not intend the Shield Law to apply here.

¶ 26 Since we conclude that the Commonwealth overcame appellants' qualified First Amendment privilege and that the Shield Law does not apply, the December 4, 2000, order underlying the contempt sanction was both constitutional and proper under Pennsylvania law. Therefore, the court's sanction does not fail on this ground.

¶ 27 We now turn to appellants' remaining two issues. First, they contend that the lower court incorrectly ordered them to submit to an "interview" with the prosecutor to disclose the pertinent statements. As we indicated previously, the court never required appellants to produce the statements in such an interview. The trial judge gave them repeated opportunities to comply with the subpoenas *duces tecum.* These opportunities took many different forms, including providing a written list of Tyson's verbatim statements, permitting an *in camera* review of their interview notes, *or* telling the prosecutor orally. Given the judge's attempts to accommodate appellants' concerns, we find the

premise of their argument to be without merit.

■ ¶ 28 Appellants' final argument is that the trial court's $40,000 contempt sanction for each reporter was a criminal contempt sanction that denied them due process and was "extraordinarily harsh and punitive." *See* Appellant's Brief at 6, 45. When faced with contemptuous conduct, a trial court may hold the contemnor in either criminal or civil contempt depending on the "dominant purpose" of its sanction. *Diamond v. Diamond,* 715 A.2d 1190, 1194 (Pa.Super.1998) (citing *In re Martorano,* 464 Pa. 66, 346 A.2d 22, 28 (1975)). The court's adjudication of contempt will be civil in nature where its goal is "to prospectively coerce the contemnor to comply with an order of the court." *Id.* A contempt sanction will only be criminal where the court seeks "to punish the contemnor for [his] disobedience ... [with] imprisonment or a fine which [he] is powerless to escape by compliance." *Id.*

■ ¶ 29 As support for their argument that this was a criminal sanction, appellants cite the trial judge's comment that they probably would not comply regardless of the dollar amount.[2] The trial judge's skepticism regarding a contemnor's willingness to comply does not in and of itself make a contempt sanction criminal. The court's December 13, 2000, order clearly indicates that the dominant purpose of the contempt sanction was to coerce appellants into complying with the subpoenas. Unlike a criminal sanction, this order gave them the power to avoid the fine if they turned over Tyson's verbatim statements. Therefore, we conclude that the sanction was imposed for civil contempt and that appellants were not deprived due process.

---

**2.** In the course of issuing this sanction, the trial judge stated, "I don't think virtually any amount of money" would lead them to pro-

duce the statements. She further said, "Even if I did $10,000 a minute, they would probably pay that."

¶ 30 Upon consideration of the $40,000 sanction imposed on each reporter, we agree with appellants that these sanctions were harsh and excessive. A trial court's authority to impose sanctions as a means of enforcing its own orders is well established, and we will not disturb such sanctions absent an abuse of discretion. *Garr v. Peters*, 773 A.2d 183, 189 (Pa.Super.2001). Here, the trial judge fined appellants a total of $80,000 for their failure to disclose Tyson's unpublished statements. Such a steep sanction on reporters is unprecedented in Pennsylvania, and we have little difficulty in ruling this an abuse of discretion. What is more shocking is that these fines of a $100 per minute accumulated during less than seven hours of trial. Therefore, we remand to the lower court so that it can determine a more appropriate dollar amount.

¶ 31 Order affirmed in part and case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 32 Dissenting Opinion by STEVENS, J.

STEVENS, J., Dissenting.

¶ 1 I respectfully dissent from the Majority's decision to affirm the trial court's order of contempt. For the reasons that follow, I would reverse the decision of the trial court's order of contempt and vacate the contempt award.

¶ 2 The first amendment to the United States Constitution provides, *inter alia*, that "Congress shall make no law ... abridging the freedom of speech, or of the press ...." U.S. Const. amend. I. It is clear that at the very least, Appellants, in their capacity as reporters, have a qualified First Amendment privilege. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

¶ 3 In the instant case, the Majority concluded that the Commonwealth overcame Appellants' qualified First Amendment privilege. I disagree. In *United States v. Cuthbertson*, 651 F.2d 189 (3d Cir.1981), *cert. denied, Cuthbertson v. CBS, Inc.*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981), the Third Circuit, citing its earlier decision in *United States v. Criden*, 633 F.2d 346, 358–359 (3d Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981), reiterated that before a reporter may be compelled to disclose confidential information, the following criteria must be met:

> First, the movant must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her sources. Finally, the movant must persuade the Court that the information sought is crucial to the claim.

*Id.* at 195–196; *See also Davis v. Glanton*, 705 A.2d 879, 885 (Pa.Super.1997).

¶ 4 A review of the record, however, is devoid of evidence submitted by the Commonwealth that the information sought is crucial to its case. A review of exchanges that transpired prior to trial indicate that the court was requiring Appellants to disclose the verbatim or substantially verbatim statements of Mr. Tyson; then, it was "up to [counsel for the Commonwealth] to determine how crucial [these statements] are." N.T. 12/13/00 at 9. The court added that after the statements were disclosed, Commonwealth counsel could "decipher whether she wants to use these statements or not ...." *Id.* at 12. As argued by Appellants, "the trial court never required the Commonwealth to demonstrate what in the published statements proved that there were crucial unpublished statements or why the speculated unpublished infor-

mation was crucial. . . ." Brief of Appellants at 27–28. · Thus, it is evident that the Commonwealth failed to meet its initial burden of establishing that the information sought was sufficiently crucial "to override the claimed invasion of First Amendment interests occasioned by the disclosure." *Branzburg*, 408 U.S. at 680, 92 S.Ct. 2646.

¶ 5 I believe that the Majority opinion incorrectly further restricts the First Amendment rights which are so important to freedom of speech and of the press.[3]

¶ 6 Contrary to the decision of the Majority, I would also find that the Pennsylvania Shield Law applies and would not permit the trial court to compel the disclosure of the criminal defendants' non-published verbatim statements. For example, the Pennsylvania Shield Law provides:

> No person engaged on, connected with, or employed by any newspaper of general circulation. . .for the purpose of gathering, procuring, compiling, editing or publishing news shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation for any government unit.

42 Pa.C.S. § 5942(a).

¶ 7 While the Majority is correct in its citation of *In re Taylor*, 412 Pa. 32, 40, 193 A.2d 181, 185 (1963), for the proposition that "source" of information includes "documents, inanimate objects and all sources of information", the Majority fails to follow the law as enunciated in *Taylor*.

¶ 8 Instead, the Majority concludes that the Pennsylvania Shield Law does not apply and bases its decision on civil cases.

For example, *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 ·A.2d 346 (1987), cited by the Majority, is actually a defamation case. Since the instant case involves application of the criminal law and thus principles of criminal law, I would find that *In re Taylor, supra*, provides the legal framework for this Court to conclude that the Pennsylvania Shield Law does apply, and thus the Commonwealth would not be entitled to the unpublished information.

¶ 9 Accordingly, I would reverse the trial court order which found Appellants to be in contempt.[4] ·

---

**3.** "Let it be impressed upon your minds, let it be instilled into your children, that the liberty of the press is the palladium of all the civil, political, and religious rights." *Junius*.

**4.** Since I find the above determination of Appellants' First Amendment claim to be dispos-

itive of this appeal, I have no occasion to address the merits of Appellants' remaining claims. *See Feden v. Consolidated Rail Corp.*, 746 A.2d 1158, 1163 (Pa.Super.2000) (declining to address allegations of error obviated by court's disposition of prior issue on appeal).