# Castellani v. The Scranton Times L.P.

484

*Richard Sprague* and *Lawrence J. Moran,* for plaintiffs.

*J. Timothy Hinton Jr.* and *W. Thomas McGough Jr.,* for defendant newspapers.

*Donald H. Brobst,* for defendant Henn.

MAZZONI, *J.,* June 3, 2005—

## I. INTRODUCTION

The above captioned matter is a civil action filed by the plaintiffs Randall A. Castellani and Joseph J. Corcoran (interchangeably referred to as Castellani and Corcoran) against the defendants *The Scranton Times,* Times Shamrock Communications L.P. (*The Tribune* and *The Scranton Times*), Jennifer Henn, and John Doe. This civil action is one grounded in defamation and centers around the publication of two front-page, nearly identical news articles appearing in *The Tribune* and *The Scranton Times* on January 12, 2004. What is before this court is a motion filed by the plaintiffs to "Compel dis-

closure of the identity of the unnamed source referred to in newspaper articles published in the January 12, 2004 editions of *The Scranton Times* and *The Tribune*." The matter, having been briefed and argued before this court by all interested parties, is now in a position for resolution.

## II. OPERATIONAL ALLEGATIONS/ PROCEDURAL HISTORY

On or about January 7, 2004, plaintiffs Castellani and Corcoran filed a civil complaint against the above named defendants. In late 2003, the Office of the Attorney General of the Commonwealth of Pennsylvania "caused to be empanelled the Twentieth Statewide Grand Jury to investigate allegations of wrongdoing at the Lackawanna County Prison." (See para. 16 of plaintiffs' complaint.) On or about December 2, 2003, plaintiffs Castellani and Corcoran, pursuant to duly-served subpoenas, testified before the aforementioned grand jury. At all times relevant hereto, but more specifically, at the time of their appearance, Castellani and Corcoran were Lackawanna County Majority Democratic Commissioners and were also members of the Lackawanna County Prison Board. (See paras. 17, 18 of plaintiffs' complaint.)

On January 12, 2004, the defendants published front page stories carrying the headlines "Dems Stonewall Grand Jury" (appearing in *The Tribune*) and "Dems Stonewall" (appearing in *The Scranton Times*). (See exhibit A of plaintiffs' complaint.) Except for the headlines, the stories are nearly identical and were authored by staff writer and defendant Jennifer L. Henn of *The Tribune*

and *The Scranton Times,* respectively. (See exhibit A to plaintiffs' motion.)[1]

Making obvious reference to both Castellani and Corcoran, and as indicated above, the headlines of both articles claim that the "Dems" stonewalled the grand jury. In *The Tribune,* and as part of the headlines, there appears the following language:

" 'Dems Stonewall Grand Jury'

"Corcoran, Castellani evasiveness infuriates jurors, source claims"

In *The Scranton Times* article, and as part of the headlines, there appears to be the following language:

" 'Dems Stonewall'

"Source: Corcoran, Castellani vague before grand jury"

The plaintiffs claim that both aforementioned articles "contain defamatory statements, innuendo and implications." In the body of the articles, and among the alleged published defamatory statements, were the following:

• Misters Castellani and Corcoran were less than candid, *The Times Tribune* has learned.

• The two were "considerably less cooperative" with the jurors, often responding with vague, evasive answers,

---

1. Lackawanna County Court Judge Terrence R. Nealon in his capacity as supervising judge of the Lackawanna County Investigating Grand Jury is currently investigating alleged leaks of secret grand jury information to defendant Jennifer Henn in 2003 and 2004. *In re County Investigating Grand Jury VIII, 2003,* no. 03 Misc. 140, Nealon, J. (Lacka. Cty. Feb. 16, 2005), *aff'd,* no. 29 MM 2005 (Pa. April 15, 2005).

including "I don't recall" and "not that I'm aware of" a source close to the investigation said.

• "Their (Casellani and Corcoran) testimony really irritated the jurors. They (jurors) were ready to throw both of them out," the source said.

• "After months of hearing all kinds of detailed, specific information and testimony, they (jurors) just had no tolerance for that kind of crap."

• "They (jurors) were ready to take out the big hook and yank each of them out of the witness chair."

A review of both articles attributed the aforementioned information to "an unnamed source close to the investigation."

The crux of the plaintiffs' defamation case is their allegation that the subject news articles were false and defamatory. In support of their claims, the plaintiffs direct this court's attention to the grand jury presentment attached as exhibit B to their motion. Plaintiffs allege that the presentment spoke of the testimony of Castellani and Corcoran having "corroborated" the grand jury investigation. Furthermore, the presentment "contained no grand jury criticism of the substance or manner of the testimony rendered by plaintiffs before the grand jury." (See para. 6 of plaintiffs' motion.)

In addition to the above, and in further support of the defamatory nature of the subject articles, the plaintiffs also direct the court to Judge Isaac Garb's September 14, 2004 memorandum. Judge Isaac Garb was the supervising judge of the subject grand jury proceedings. Shortly after the publication of the subject articles, counsel for the plaintiffs presented Judge Garb with a peti-

tion for sanctions. The petition was predicated on alleged disclosures of the grand jury proceedings to the *Scranton Times* and *Tribune*. Judge Garb denied the petition for sanctions based on a lack of standing but appointed a special prosecutor to investigate the source of "unlawfully disclosed matters." (See J. Garb's order dated April 13, 2004, attached to exhibit E to plaintiffs' motion.) Upon conclusion of the investigation, the special prosecutor was directed to "submit a written report" to Judge Garb. (See exhibit E to plaintiffs' motion.)

Upon review of the special prosecutor's report, Judge Garb, in his memorandum of September 14, 2004, concurred with the special prosecutor that "there was no breach of secrecy by any agent of the Attorney General's office." Furthermore, Judge Garb concluded:

"In re: 20th Statewide Investigating Grand Jury, Dauphin County, Pennsylvania

"The reports in these newspapers which purport to be a reflection of the testimony of Randall Castellani and Joseph Corcoran are totally at variance with the transcript of their testimony before the grand jury. The characterization of their testimony in the newspaper reports is belied by the record. Each witness testified unhesitatingly and clearly. The witnesses were cooperative. Their testimony was not vague. At no time did the grand jurors become irate or indicate a readiness to throw the witnesses out of the grand jury room . . . .

"We have reviewed that report, and all of the documents filed with it, including the testimony of each of these witnesses, as well as the newspaper reports, and concur in that conclusion. The reports published in these

newspapers are completely at variance with the transcript of the testimony of the witnesses. The newspaper reports provide that the witnesses were evasive in their answers, were non-cooperative, essentially 'stonewalled' the grand jury in its inquiry and that the grand jurors became irate as a result of that demeanor on the witnesses' part, and demanded that they be 'thrown out' of the grand jury courtroom. None of those things happened. Obviously, if someone wished to leak the testimony of a witness to the grand jury that information relayed to the media would have reflected the testimony that actually occurred. The report of the testimony of the witnesses was totally at variance and not borne out by the record of the witness' testimony. Obviously, the source of the reporter's information was someone not privy to the grand jury proceedings and therefore, not someone in the office of the Attorney General.

"/s/Isaac S. Garb, Senior Judge" (See exhibit F to plaintiffs' motion.)

The plaintiffs argue that based upon the above backdrop, it cannot be disputed "that the information attributed to the unnamed source in *The Scranton Times* and *The Tribune* January 12, 2004 newspaper articles were lies, were false, and were inaccurate." (See para. 15 of plaintiffs' motion.) Furthermore, and referencing *The Times'* and *Tribune's* "posted policies and procedures," the defendants *Times* and *Tribune* have adopted a policy to waive any confidentiality if "a source lies to the newspaper." (See exhibit G of plaintiffs' motion.)

The plaintiffs claim that the source upon whom the defendants have relied "engaged in tortious, criminal or contemptuous conduct." The plaintiffs further claim that

the "sole and exclusive possession" of the identity of the source lies with the defendants. The plaintiffs also assert that they have exhausted all efforts to attain the identity of the source by other means. Plaintiffs have demanded of the defendant newspapers to disclose the source which they have correspondingly refused. Plaintiffs have also requested of Judge Barry Feudale (new supervising judge of the statewide grand jury), among other documents, release of the special prosecutor's report. To the best of this court's knowledge, that request is still pending.

In response to the requested disclosure, defendants *Times* and *Tribune* and Ms. Henn have asserted their privilege pursuant to the Pennsylvania Shield Law, 42 Pa.C.S. §5942(a), and the First Amendment reporter's privilege.

## III. POSITIONS OF THE PARTIES AT ARGUMENT

Acknowledging that there are no Pennsylvania cases that specifically support the plaintiffs' claim for relief under the Shield Law, plaintiffs' counsel submits that the facts of this case should support the creation of an exception to the privilege afforded the defendants by the Pennsylvania Shield Law and the First Amendment. Plaintiffs submit that it is not in the public interest "to publicize the deliberations" of a grand jury proceeding which operates under a statutorily and judicially imposed confidential setting.

Distinguishing this case from a list of previously cited Pennsylvania cases, Attorney Richard Sprague (plaintiffs' counsel) asserted that it is clear that if the defendant reporter spoke to someone who witnessed the grand

jury proceeding, she violated the law by disclosing witness' testimony, as well as the jurors' reactions to same. The only participants in the process who can disclose such information, without a court order, are the witnesses themselves, and in this case, it is clear that it is not Misters Castellani or Corcoran.

By analogy, Attorney Sprague referenced various statutorily created privileges which on their face, appear to be absolute in nature and in application. However, over the years, such privileges as the attorney-client privilege (42 Pa.C.S. §5916[2] and 42 Pa.C.S. §5928[3]) and the accountant-client privilege (63 P.S. §9.11a) have given way to the crime/fraud exception. Citing a California Superior Court case (Santa Clara County), Attorney Sprague emphasized that the courts are recognizing that statutorily created privileges are not absolute in nature and the courts have carved out exceptions where the interests of the public are paramount to the interests of confidentiality. *Apple Computer Inc. v. Doe 1,* Cal. Super. Ct. no. 1-04-CIV-032178 (March 11, 2005).

In addition to the above, and further distinguishing previous case law, Attorney Sprague argues that the facts of this case strongly supports that the defendant media were "participants" in the crime and/or fraud. More specifically, Attorney Sprague submits that it is apparent that the media was involved in the solicitation of criminal contempt and/or obstruction of justice. By receiving and/or soliciting this information, the media is aware, or

---

2. 42 Pa.C.S. §5916 applies to criminal proceedings.
3. 42 Pa.C.S. §5928 applies to civil proceedings.

should be aware, that the behavior is susceptible to criminal contempt proceedings.

Attorney for the defendants, Tim Hinton, argues that there is no authority to support the requested disclosure of the unnamed source. Citing five leading Pennsylvania cases that have defined the parameters of the Pennsylvania Shield Law, there is simply no Pennsylvania authority which carves out an exception to the Shield Law regarding the disclosure of unnamed sources.

Attorney Hinton first makes specific reference to the language of the Shield Law itself. 42 Pa.C.S. §5942. There is no crime/fraud exception "built into" the statute itself. Furthermore, and citing to *Sprague v. Walter,* 518 Pa. 425, 435-36, 543 A.2d 1078, 1083 (1988), and *Davis v. Glanton,* 705 A.2d 879 (Pa. Super. 1997), our appellate courts have interpreted the privilege contained in the Shield Law as an "absolute privilege against the disclosure of sources." (See para. 32 of transcript of argument.)

Attorney Hinton citing *Davis, supra,* and *Hatchard v. Westinghouse Broadcasting Co.,* 516 Pa. 184, 195, 532 A.2d 346, 350 (1987), recognized that the privilege does not extend to documents and/or materials, if production does not, nor would not, lead to the disclosure of the unnamed confidential source. Even where documents and/or materials are the focus of the parties' disclosure requests, our appellate courts have been specific about protecting the anonymity of the undisclosed source.

Attorney Hinton further argues that the case of *In re Taylor,* 412 Pa. 32, 193 A.2d 181 (1963), is most analo-

gous to the case at bar. In *Taylor,* a grand jury was convened, the focus of which was alleged criminal conduct and corruption in the legislative and executive branches of the City of Philadelphia. The press published the substance of the district attorney's interrogation of one Mr. John Fitzpatrick (former Democratic Ward leader) which took place within the district attorney's office. It was suggested that the release of the Fitzpatrick interviews constituted a crime. Attorney Hinton submits that, in *Taylor,* the court balanced the conflicting interests and found that the public welfare would be better served by protecting the unnamed source than by disclosing same. Accordingly, Attorney Hinton argues that our appellate courts have addressed the issue before this court head-on and have found the interests supporting confidentiality to be paramount. (See para. 39 of transcript of argument.)

Putting aside the protection afforded by the Shield Law, Attorney Hinton also argued that the plaintiffs have not exhausted other sources of information to pierce the qualified privilege afforded to the media under the First Amendment. Relying on *Branzburg, infra,* and a variety of Third Circuit cases, Attorney Hinton submits that plaintiffs need to establish that "all possible avenues to obtain the information have been explored." (See transcript of argument, p. 41.) In this case, the plaintiffs have filed their motion to compel on the same day the complaint was filed. Plaintiffs have not taken any depositions to date. Accordingly, Attorney Hinton claims that the plaintiffs have not satisfied the requisite criteria to overcome the defendants' qualified privilege.

Attorney Donald A. Brobst, private counsel for defendant Henn, referenced two United State Supreme Court cases in addressing plaintiffs' assertion that the media in this case were participants in a crime. *Bartnicki v. Vopper,* 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001); *Landmark Comm. Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). Attorney Brobst, citing *Landmark,* argued that there is no evidence in this case to suggest that the defendants did anything other than publish a story from a confidential source. Even if the disclosure itself is a crime, the protection afforded to the reporter under the First Amendment outweighs the interest of confidentiality and disclosure. (See transcript of argument, p. 62.) In *Landmark,* the newspaper owner was convicted of a breach of confidentiality for publishing an article which reported confidential proceedings of the Virginia Judicial Inquiry and Review Commission. Attorney Brobst argued that the U.S. Supreme Court in *Landmark* held that the "First Amendment guarantee of freedom of speech and the freedom of press did not permit the punishment of the news media or other third persons who are non-participants in the initial investigative proceedings for publishing truthful information regarding the commission's confidential proceedings." (See transcript of argument, pp. 58-60.)

Attorney Brobst also cited *Bartnicki* for essentially the same proposition. *Bartnicki* involved a radio station's publication of illegally intercepted tapes which, by statute, are illegal to be used in such a fashion. As in *Landmark,* the U.S. Supreme Court in *Bartnicki* held that the First Amendment interest of the news media outweighs the privacy interest that the involved statute protects.

## IV. ISSUES

A. *Does the Scope of the Pennsylvania Shield Law, 42 Pa.C.S. §5942, Preclude Disclosure of the Identity of Defendants' Confidential Source(s)?*

B. *Whether Requiring the Defendants To Identify and Disclose the Source(s) of Their Information Abridge and/or Violate the Freedom of Speech and Press Guaranteed by the First Amendment of the United States Constitution?*

## V. DISCUSSION

A. *Pennsylvania Shield Law, 42 Pa.C.S. §5942.*

The defendants first allege that the privilege afforded them by the Pennsylvania Shield Law is an absolute privilege. More particularly, the defendants maintain that the absolute privilege shields reporters from compelled disclosure of their confidential source(s). The Shield Law provides, in relevant part, as follows:

"*Section 5242: Confidential communications to news reporters.*

"*(a) General rule.*—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person,

in any legal proceeding, trial or investigation before any government unit." 42 Pa.C.S. §5242.

The purpose of the Shield Law is to encourage the free and open exchange of "ideas" between individuals who share a "unique relationship" even if the source is a most "unsavory source." *Sprague v. Walter,* 518 Pa. 425, 543 A.2d 1078 (1988). The Pennsylvania Supreme Court in *In re Taylor,* 412 Pa. 32, 193 A.2d 181 (1963), had adopted a very broad application of the Shield Law. The Supreme Court, in *Taylor,* interpreted the words "source of information" to include "documents as well as personal informants." The rationale behind this liberal construction was stated as follows:

"[T]he statute must be liberally construed in favor of the newspapers and news media. Newspapers are owned by individuals or private corporations; they are run, operated and managed by human beings, and consequently are sometimes biased, sometimes unfair, sometimes inaccurate, and sometimes wrong. Nevertheless, independent newspapers are today the principal watch-dogs and protectors of honest, as well as good, government. They are, more than anyone else, the principal guardians of the general welfare of the community and, with few exceptions, they serve their city, state or nation with high principles, zeal and fearlessness. They are, in the best sense of the maxim, 'pro bono publico.' . . .

"We would be unrealistic if we did not take judicial notice of another matter of wide public knowledge and great importance, namely, that important information, tips and leads will dry up and the public will often be deprived of the knowledge of dereliction of public duty,

bribery, corruption, conspiracy and other crimes committed or possibly committed by public officials or by powerful individuals or organizations, unless newsmen are able to *fully and completely* protect the sources of their information. . . ." *Taylor, supra* at 40, 41, 193 A.2d at 185. (emphasis in original)

The Shield Law's unqualified privilege, as pronounced in *Taylor,* was revisited in the case of *Hatchard v. Westinghouse Broadcasting Co.,* 516 Pa. 184, 532 A.2d 346 (1987). *Hatchard* involved a consolidation of libel actions against local television stations and their parent broadcasting companies for news broadcasts that allegedly defamed the plaintiffs. As part of their discovery requests, the plaintiffs requested production of "outtakes" but excluded, however, any material where the source was revealed or any material which could lead to the disclosure of the source. The defendants, relying on *Taylor,* claimed that they enjoyed an absolute and unqualified privilege under the Shield Law and refused plaintiffs' request.

The Supreme Court in *Hatchard* recognized the development and "constitutionalization of defamation law" since *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *New York Times Co. v. Sullivan, supra,* the United States Supreme Court held that the First Amendment required a privilege of fair comment and honest mistake of fact with respect to public officials. Accordingly, public officials could not recover for defamation claims absent proof that the statement was made with "actual malice." The *Hatchard* court also acknowledged that the Pennsylvania Constitution recognizes reputation as "one of the fundamental rights

that cannot be abridged without compliance with state constitutional standards of due process and equal protection." *Hatchard, supra* at 193, 532 A.2d at 350.

Recognizing that the burden lies with the plaintiff throughout the entire trial, and of course considering the broad application of the Shield Law verbalized in *Taylor,* the *Hatchard* court departed from *Taylor* and held:

"If unpublished information which would not reveal confidential sources could be withheld by the media defendant, it would be virtually impossible for the plaintiff to arrive at those facts of which the defendant was aware at the time of publication other than the defamatory information actually disseminated to the public. . . .

"It is obvious that in some instances documentary information can be disclosed to a plaintiff in a libel action without revealing the identity of the person who conveyed the information to the defendant in confidence. In other instances, the nature of the documentary information or the circumstances of its acquisition would render disclosure of the information impossible without a disclosure of the person who conveyed it." *Hatchard, supra* at 191-92, 532 A.2d at 349.

The question before the Supreme Court in *Hatchard* was whether the statute reflects a legislative intent to protect all documentary information from discovery regardless of whether the documents and information could reveal a confidential media informant. In interpreting the legislative intent, the *Hatchard* court held . . . .

"We do not believe the legislature has evinced any intention to make it close to impossible for the individuals to seek redress against the media for maliciously or

negligently publishing false statements that seriously damage the reputations of individuals. Such a result would follow if we interpreted the Shield Law as broadly as appellees urge because of the changes in the law of defamation since *In re Taylor* was decided, and would run afoul of the principle of statutory construction that the legislature must be presumed not to intend a result that is absurd, impossible of execution or unreasonable. 1 Pa.C.S. §1922(1)." *Hatchard, supra* at 192-93, 532 A.2d at 350.

Furthermore, and relying on a person's constitutional right to reputation, the Supreme Court concluded:

"We therefore conclude that, to the extent that language in *In re Taylor* may be read as interpreting the Shield Law to protect from discovery, in defamation actions, documentary material that could not reasonably lead to the discovery of the identity of a confidential media-informant, that decision interpreted the Shield Law much too broadly. Given the present state of First Amendment jurisprudence, such an interpretation would not adequately protect the fundamental right of reputation guaranteed to the citizens of this Commonwealth. We therefore hold that unpublished documentary information gathered by a television station is discoverable by a plaintiff in a libel action to the extent that the documentary information does not reveal the identity of a personal source of information or may be redacted to eliminate the revelation of a personal source of information." *Hatchard, supra* at 195, 532 A.2d at 351.

The interpretation of our Shield Law in *Hatchard* was affirmed by the Pennsylvania Superior Court in *Davis v.*

500

*Glanton,* 705 A.2d 879 (Pa. Super. 1997). Once again, *Davis* was a defamation suit that was brought against trustees of a foundation. The plaintiffs in this case subpoenaed the nonparty newspaper and reporter to turn over certain materials. The newspaper and reporter claimed that they were protected from compelled disclosure of any materials by reason of the Shield Law. The Superior Court in *Davis* disregarded the media's status as a nonparty and essentially followed the Superior Court's ruling in *Hatchard.* Accordingly, the Superior Court held as follows:

"Accordingly, we hold that, under the principles enunciated in *Hatchard,* the Shield Law does not excuse *Inquirer* from production of subpoenaed materials which cannot reasonably lead to the discovery of the identity of a confidential media-informant or which can be redacted to eliminate the revelation of such a source of information. In the present case, the trial court ordered *Inquirer* to release all material pertaining to conversations with disclosed sources. Under the principles set forth in *Hatchard,* the Shield Law permits such disclosure only if the material cannot reasonably lead to the discovery of the identity of another, undisclosed source, or can be redacted to prevent such revelation." *Davis, supra* at 885.

One of the most recent appellate pronouncements in the Shield Law can be found in *Commonwealth v. Bowden,* 576 Pa. 151, 838 A.2d 740 (2003). In this case, one Brian Tyson was on trial for a drug-related killing. Tyson, at some point, admitted to the killing but later claimed he had acted in self defense. Some time before the trial, Tyson contacted and talked to *Philadelphia In-*

*quirer* reporter Mark Bowden and *Philadelphia Tribune* reporter Linn Washington Jr. about his case and the details of the shooting. Both Bowden and Washington authored a series of articles and/or editorial pieces which included Tyson's claim of self defense. Recognizing that these articles contain statements attributable to Tyson that were inconsistent with his official statements to authorities, the prosecution subpoenaed Bowden and Washington to appear on the day of trial and produce all notes of interviews and/or phone conversations with Tyson. Bowden and Washington moved to quash the subpoena based on the Shield Law and the qualified privilege arising out of the First Amendment of the United States Constitution.

The trial court in *Bowden* denied the reporters' request under the Shield Law because the alleged source was not confidential and the Shield Law was intended to only protect a source's identity. The trial court also found that the qualified privilege guaranteed by the First Amendment also did not apply. On the issue of privileges, the Superior Court affirmed the lower court's decision citing the post-*Taylor* decision of *Hatchard v. Westinghouse Broadcasting Co., supra,* and *Davis v. Glanton, supra.* The Superior Court remanded the case back to the trial court for a more appropriate sanction to be imposed.

The Supreme Court in *Bowden* entertained a comprehensive analysis of, among other cases, *Taylor* and *Hatchard.* Rejecting the reporter's claim that *Taylor* controls, the Superior Court held:

"Tyson made the subject statements to Bowden and Washington, his identity is not confidential, and there is no indication or allegation in this case that the identities

of other individuals from whom Tyson may have obtained information will be revealed if Tyson's statements are disclosed. Therefore, unlike *Taylor,* there is no indication here that the identity of . . . other persons may [be] revealed through exposure of Tyson's statements. . . . *Taylor,* 193 A.2d at 186; see *Tyson,* 800 A.2d at 333 ('[T]yson only spoke to the reporters about his own actions, and therefore, there is also no danger that disclosure of his unpublished statements would reveal any confidential informants.'). Accordingly, based on an appropriate reading of *Taylor,* we conclude that the Shield Law does not afford a complete defense to disclosure of Tyson's statements." *Commonwealth v. Bowden, supra,* 838 A.2d at 749-50. (footnote omitted)

Furthermore, the Supreme Court in *Bowden* noted *Hatchard's* pronouncement on the purpose and scope of the Shield Law:

"The obvious purpose of the Shield Law is to maintain a free flow of information to members of the news media. We fail to see how this purpose is promoted by protecting from discovery documentary information that was in the possession of the publisher of the defamatory statement, where disclosure of this information would not reveal the identity of a confidential media-informant. While there may be some who would only share information with the media if the media enjoyed an absolute shield from any discovery in civil proceedings, providing an absolute shield could hardly be said to be necessary to effectuate the purpose of the Shield Law in light of the information that flows freely in states that have enacted more carefully-tailored shield laws and the considerable burden of proof imposed on the

defamation plaintiff by the requirements of the First Amendment. We see no apparent reason why the objective of promoting the free flow of information to the media would be defeated so long as any documentary information that could lead to the discovery of the identity of a confidential informant is shielded from disclosure." *Bowden, supra,* 838 A.2d at 750, citing *Hatchard, supra.*

The *Bowden* court further took notice that the Shield Law, in the past, has been raised in both criminal and civil settings. In so doing, the Supreme Court saw "no principled reason why the interpretation of the Shield Law espoused" in *Hatchard* and *Sprague,* (defamation cases) "should not apply in other settings" such as was demonstrated in *Bowden.* The Shield Law statute makes no distinction regarding its application. Thus, the disclosure in *Bowden* was found not to inhibit the free flow of information to the media through the revelation of any confidential source.

The defendants advocate that the Shield Law has provided the media with an absolute privilege. Except for the departure expressed in *Hatchard* and *Davis,* the Shield Law has afforded the media with an unqualified privilege against the disclosure of the identity of the source, or of the materials and/or documents which may lead to the identity of the source. Because of the alleged facts of this case (as those facts appear on their face), and because this case allegedly involves an apparent wrongful disclosure from a statutorily mandated proceeding, the impacted, competing, and conflicting interests deserve analysis and an assessment of priority.

This opinion is intended to be limited to the facts of this case and should not be given any broader application. Furthermore, this court makes no finding on the ultimate merits of the plaintiffs' causes of action. The order of this court and the reasons expressed in support thereof do not go beyond the issues before this court for review.

Addressing the merits of the plaintiffs' motion as well as the merits of the defendants' assertion of privilege, this court will not speculate as to the realm of possible sources (if any at all) the reporter could have used as a basis for the article. This court will assume that the source is a source close to the underlying criminal investigation and one which was present during, or privy to, the actual grand jury testimony at issue. To assume otherwise would not only be contrary to the tenor of the articles themselves but contrary to the policy guidelines of the newspaper which calls for first-hand knowledge when assessing reliability of the source and the information communicated. (See exhibit G to plaintiffs' brief.) The "Newsroom policies and procedures" regarding "unnamed sources" provide, in part, as follows:

*"Unnamed sources*

*"The use of unnamed sources in published stories dilutes our credibility and should be minimized. The preferred practice is that reporters confirm news on the record; only when serious efforts to do so have failed should the use of unnamed sources be considered.*

"(1) An assistant managing editor or managing editor must approve the use of an unnamed source. Approval will be given only after an assistant managing editor or

the managing editor is informed of the source's identity and ensures that the use of the source meets these guidelines.

"(2) Unnamed sources may be used only for factual information that cannot be obtained elsewhere. They should not be used solely for colorful quotes. Nor, as a matter of fairness, should they be used for unsubstantiated accusations or 'cheap shots' about an individual.

"(3) Information from an unnamed source should be corroborated by a second source or public documents.

"(4) *Unnamed sources must be in a position to know, with first-hand knowledge of the information.*" (See exhibit G to plaintiffs' motion to compel.) (emphasis added)

The original source of the disclosed information appears to have been derived from someone who was within the four walls of the grand jury proceeding itself. The unidentified source not only speaks of actual testimony but the alleged visible reaction and demeanor of grand jurors to the plaintiffs' testimony. For instance, the articles not only state that the source said that the plaintiffs' answers were "vague" and "evasive," but that the plaintiffs' answers "really irritated the jurors." The articles further stated that the source said that "they" (grand jurors) "were ready to throw both of them out" and "they" (grand jurors) "just had no tolerance for that kind of crap." Accordingly, the above information strongly suggests that the source visibly observed the reactions of the grand jury.

Correspondingly, this court cannot state with certainty that the reporter did anything but report information voluntarily offered to her. Whether she knowingly solicited

the information from a source sworn to secrecy cannot be determined at this time. For purposes of this opinion, this court will not speculate as to how the information was communicated to the reporter. We recognize that the plaintiffs argue that the defendant reporter may have committed a criminal act by soliciting the subject information, this, however, is not critical to this court's determination.

The rationale behind the Shield Law is the overwhelming acceptance that there is a need for the "free flow of information to members of the news media." *Commonwealth v. Bowden, supra,* 838 A.2d at 750. The corollary of the right to publish is the right to gather information. This right to gather information is dependent upon access to information provided in confidence. Unless the confidential source is protected, the news media's ability to attain such information will be significantly, and at times fatally, compromised.

The grand jury has a rather long and time-honored history in our American system of jurisprudence. "Historically, (the grand jury) has been regarded as primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or was dictated by an intimidating power, or by malice and personal ill will." *Branzburg v. Hayes,* 408 U.S. 665, 688 n.23, 92 S.Ct. 2646, 2660 n.23, (1972), citing *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373 (1962). *Currently,* the grand jury system in Pennsylvania, like other states, is a statutory creature. Pennsylvania Investigating Grand Jury Act, 42 Pa.C.S. §4541

et seq. The investigating grand jury has been recognized as a "very powerful prosecutorial tool and can be of significant value in contemporary American society." *Savitt, Pennsylvania Grand Jury Practice,* (1983). Secrecy is an integral and important part of the process with intended criminal ramifications if breached. The requirement of secrecy is specially addressed in 42 Pa.C.S. §4549(b).

"*Section 4549 Investigating grand jury proceedings*

"*(b) Disclosure of proceedings by participants other than witnesses.* Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the Commonwealth for use in the performance of their duties. The attorneys for the Commonwealth may, with the approval of the supervising judge, disclose matters occurring before the investigating grand jury including transcripts of testimony to local, state, other state or federal law enforcement or investigating agencies to assist them in investigating crimes under their investigative jurisdiction. Otherwise, a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court. *All such persons shall be sworn to secrecy, and shall be in contempt of court if they reveal any information which they are sworn to keep secret.*" 42 Pa.C.S. §4549(b). (emphasis added)

The Pennsylvania "Investigating Grand Jury Act" designates the judiciary, in the form of a supervising judge, as a guardian of secrecy. The supervising judge adminis-

ters the oath of secrecy to all participants and is also entrusted with control of all of the transcripts derived therefrom. The role of the supervising judge in the grand jury process was clearly described in *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345 (3d Cir. 2003). This court held,

"As is evident from these [statutory] provisions, Pennsylvania's grand jury process is 'strictly regulated,' [citation omitted], and the supervising judge has the singular role in maintaining the confidentiality of grand jury proceedings." *Camiolo, supra* at 356.

As one author described,

"Any breach of the rule of grand jury secrecy has potentially serious repercussions . . . The one individual most responsible for this task is undoubtedly the supervising judge. His obligation is the zealous imposition and prudent enforcement of the rule of secrecy." *Savitt, Pennsylvania Grand Jury Practice* §17.06, pp. 76-77 (1983).

"It is well established in numerous court decisions that proceedings before a grand jury are protected by a general rule of secrecy." *In re November 1975 Special Investigating Grand Jury (Appeal of Fitzgerald)*, 299 Pa. Super. 539, 544, 445 A.2d 1260, 1262-63 (1982). As the Supreme Court of Pennsylvania has observed, "... there is no need to stress the vital importance of the maintenance of secrecy in regard to the deliberations and proceedings of grand juries, for the policy of the law in that respect has been so long established that it is familiar to every student of the law." *Commonwealth v. Smart*, 368 Pa. 630, 633, 84 A.2d 782, 784 (1951). In fact, the authority

for grand jury secrecy in Pennsylvania dates back to the Frame of Government enacted by the Provincial Assembly in 1696, see *Commonwealth v. Kirk,* 340 Pa. 346, 17 A.2d 195, 199 (1941), and the United States Supreme Court has described this important policy as "older than our nation itself." *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399 (1959).

The Pennsylvania Supreme Court has referred to grand jury secrecy as "indispensable to the effective functioning of a grand jury's investigation." *In re Investigating Grand Jury of Philadelphia Cty. (Appeal of Philadelphia RustProof Co., Inc.),* 496 Pa. 452, 457-58, 437 A.2d 1128, 1130 (1981). The principal reasons articulated by the Supreme Court for ensuring grand jury secrecy are: (1) in order to be guaranteed the utmost freedom to the grand jury in its deliberations, the grand jurors should be free from apprehension that their opinions and votes may subsequently be disclosed by compulsion; (2) so as to encourage free and untrammeled disclosures by willing witnesses who have information concerning criminal conduct, witnesses summoned before the grand jury should be free from apprehension that their testimony may subsequently be disclosed by compulsion; (3) to prevent the guilty accused from being provided with information that might enable the target of the investigation to flee from arrest, suborn false testimony, or tamper with witnesses or grand jurors; and (4) to protect the innocent accused, who is exonerated by the grand jury's refusal to charge, from disclosure of the fact that [s]he has been under investigation. See *Commonwealth v. Columbia Investment Corp.,* 457 Pa. 353, 369-70 n.17, 325 A.2d 289, 297 n.17 (1974); *Philadelphia RustProof*

*Co. Inc., supra.* Because of the secrecy surrounding the grand jury proceedings, "the grand jury is a particularly suitable body to investigate misconduct of public officials and public evils." *In re County Investigating Grand Jury of April 24, 1981 (Appeal of Krakower),* 500 Pa. 557, 563, 459 A.2d 304, 307 (1983).

"The Pennsylvania Legislature and Supreme Court have established rules to preserve this secrecy requirement." *Commonwealth v. Mallon,* 356 Pa. Super. 493, 501, 515 A.2d 1, 5 (1986), *appeal denied,* 515 Pa. 599, 528 A.2d 956 (1987); see also, *Camiolo v. State Farm Fire & Casualty Co.,* 334 F.3d 345, 355 (3d Cir. 2003) ("Through the enactment of the Investigating Grand Jury Act, see 42 Pa.C.S. §§4541-4553, Pennsylvania's legislature has endeavored to ensure the secrecy of the grand jury proceedings conducted in that state by limiting access to the transcripts of these proceedings."). Pennsylvania Rules of Criminal Procedure 224, 225, 231(C) require the grand jurors, "[a]ll court personnel who are to be present during any portion of the grand jury proceedings, and all others who assist in the proceedings," and any other "persons who are to be present while the grand jury is in session[,]" to be administered a secrecy oath. The Investigating Grand Jury Act further requires attorneys for the Commonwealth to first secure the approval of the supervising judge before disclosing any grand jury information "to local, state, other state or federal law enforcement or investigating agencies to assist them in investigating crimes under their investigative jurisdiction." 42 Pa.C.S. §4549(b). Any grand juror, attorney, interpreter, stenographer, recording device operator or typist who discloses grand jury matters without express

permission from the court "shall be in contempt of court if they reveal any information which they are sworn to keep secret." *Id.* Moreover, although grand jury witnesses are generally permitted to disclose their testimony to their counsel and others, the supervising judge may nevertheless prohibit such disclosure "for cause shown." 42 Pa.C.S. §4549(d).

Pennsylvania courts have shown deference for grand jury secrecy by rejecting attempts to compel grand jury witnesses to acknowledge the fact that they have appeared before an investigative grand jury. In *Appeal of Fitzgerald, supra,* a candidate for public office sought to compel his opponent to declare in a public forum whether or not he would agree to disclose his grand jury testimony in accordance with 42 Pa.C.S. §4549(d). In affirming the denial of the candidate's request, the Superior Court of Pennsylvania referenced the stigma which can be attached to a witness' grand jury appearance and remarked:

"Subsection (d) of the [grand jury] law, as quoted above, unmistakably conveys the legislative contemplation that one who had been a witness before an investigating grand jury could *voluntarily* disclose his or her testimony to others, contrary to the normal secrecy rules applicable to such testimony, which rules will be more fully discussed later in this opinion. The law, in *permitting* such *voluntary* disclosure by a witness, simply cannot be construed to support the actions of another person who institutes an action to *force* disclosure by *compelling* the witness to take the stand to declare in a public forum whether or not he or she will disclose his or her testimony before the grand jury. Any person who has so

testified cannot, under existing law, be placed into the potentially humiliating circumstance where he or she will be *forced,* in open court, to make such an election regarding disclosure. In such circumstances, a refusal to agree to make a disclosure would obviously create widespread public suspicions and distrust of the witness, even if the refusal of disclosure was based upon entirely innocent or even laudatory grounds, such as the protection of innocent persons whose identities or activities were the subject of some grand jury inquiry." *Appeal of Fitzgerald,* 299 Pa. Super. at 542, 445 A.2d at 1262. (emphasis in original)

The Supreme Court of Pennsylvania regards the state interest in grand jury secrecy to be so important as to outweigh other competing constitutional or statutory rights. In *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896 (1975), *cert. denied,* 423 U.S. 1083 (1976), the supervising judge of a grand jury disqualified attorneys in a law firm, who were paid by the Fraternal Order of Police, from representing multiple policemen who had been subpoenaed to testify before a grand jury which was investigating police corruption. The police witnesses argued that the disqualification order violated their Sixth Amendment right to the assistance of counsel of their own choosing, their counsel's right to pursue the practice of law, and the police officers' First Amendment right to collective activity undertaken via the F.O.P. to maintain meaningful access to the courts. 462 Pa. at 520, 341 A.2d at 900-901. In upholding the supervising judge's disqualification order, the Supreme Court underscored the importance of grand jury secrecy and held:

"The existence of multiple representation jeopardizes the time-honored concept of grand jury secrecy. Such secrecy is designed to protect the Commonwealth, the grand jurors, and the witnesses. [citations omitted] If one of the witnesses reveals his testimony before the grand jury to his attorney, as he has every right to do, certainly the attorney will feel obligated, perhaps even subconsciously, to reveal to his other clients the testimony of the first witness. With the attorney in such a position, either the attorney-client relationship or the grand jury secrecy must suffer. Similarly, if, as will be shown, there is an attorney-client relationship between Attorney Pirillo and the F.O.P., then Pirillo might be compelled to advise the F.O.P. as to the testimony of the several petitioners/witnesses. These reevaluations could be inimical to the interests of not only the Commonwealth and the grand jurors, *but also to the individual witnesses themselves, all of whom are intended beneficiaries of the traditional grand jury secrecy.*" *Id.* at 525-26 n.5, 341 A.2d at 903 n.5. (emphasis added) Consequently, the *Pirillo* court concluded that the state interest in the grand jury secrecy preempted the competing constitutional and statutory rights asserted by the police officers, and stated:

"Furthermore, the interests of the state are sufficiently compelling to justify appropriately tailored infringements of constitutional rights. We have earlier pointed out that each right asserted by the petitioners is susceptible to curtailment. We have also endeavored to demonstrate that the state interests are sufficiently strong to justify some incursion upon the rights invoked by petitioners. The court in its supervisory capacity over the grand jury must be alert to prevent as far as possible abridgement of that

514

body's function which is to investigate public wrongs and to bring indictments for the protection of society. The secrecy surrounding grand jury proceedings is a mechanism to ensure the safety and reputation of witnesses and grand jurors." *Id.* at 530, 341 A.2d at 905; accord *In re Investigating Grand Jury of Philadelphia County (Petition of Miller)*, 527 Pa. 432, 593 A.2d 402 (1991).

After considering the competing and conflicting interests as articulated above, this court firmly believes that the public interest is better served by maintaining and enforcing the secret and confidential operation of the grand jury system. The obvious purpose of the Shield Law is to promote the free flow of information to the media. *Commonwealth v. Bowden, supra.* When this purpose, however, clashes with the need to enforce and protect the foundation of the grand jury purpose, the Shield Law should relinquish its priority. Affording the grand jury process its respect will empower the courts to protect the wide variety of interests that are expected to be safeguarded by the process.

The court recognizes and accepts the purpose of the Shield Law and the First Amendment qualified privilege. The court also recognizes and embraces the importance of the public function served by the news media. The limited application of this ruling will not have a chilling effect on the ability of reporters to investigate and report on matters of public concern. By this ruling, we are hopeful that the news media recognizes that grand jury proceedings are confidential and are to remain so. It is the re-publication of a grand jury "leak" in a newspaper of general circulation which denigrates the process. The

news media should not act as a protective vessel into which criminal communications are channeled and later exonerated at the expense of our judicial system. We are not advocating a broad application of this opinion. We recognize the need for a reporter to rely upon confidential sources in investigating and reporting on criminal activity and on ongoing criminal investigations. The public interest is not served, however, when a reporter, through an unnamed source, invades the grand jury process and pierces its recognized veil of confidentiality.

What distinguishes this case from its predecessors is the nature of the communication and its respective genesis. The communication does not talk about a crime—it is the crime. This is not a case about insiders at powerful institutions leaking information to a journalist. This is not a case where someone is confidentially providing information about a crime or other wrongful activity that has or is taking place. This is a case about protecting witnesses who cooperate and assist the prosecution in securing indictments and a case about guaranteeing the grand jury's utmost freedom in its deliberations. This is a case where the communication and its source, if protected, undermines the grand jury process and renders the supervising judge's enforcement powers meaningless. Furthermore, and more importantly, granting an absolute privilege in this case would reduce the oath of secrecy to a fruitless exercise and all the guarantees and underpinnings associated therewith to nothing more than empty promises.

The leak or disclosure is one thing. The publication of the leak or disclosure, however, significantly magnifies the criminal invasion and ultimately "chills" and under-

mines the grand jury process. The participants of the grand jury, particularly the witnesses and jurors, rightfully expect the courts of this Commonwealth to protect and safeguard the presentment of evidence and the inquiries regarding same. To allow the publication and republication of grand jury proceedings without appropriate consequences would reduce the protections and safeguards we cherish to a mere nullity. In essence, we would be sanctioning and acknowledging criminally contemptuous conduct by creating a conduit in which grand jury proceedings could be disclosed with impunity and without appropriate repercussions.

By this decision, this court does not anticipate any invasion upon the news media's protected right to conduct investigations and gather information in relation thereto. The defendant news reporter may argue that her ability to obtain news would be compromised if her privilege is not protected. In this case, this anticipated assertion is, at best, tenuous and essentially not germane to the facts associated herewith. Assuming that the assertion is true, the only "fall-out" expected would be a corresponding inability to obtain information from a process that is intended to be confidential. What harm can come about if participants sworn to secrecy are reluctant to speak to the media about a subject matter or proceeding on which they are precluded to speak. Furthermore, it is expected that more harm can and does occur if the so-called secrecy of grand jury proceedings have fallen victim to those who, by their actions, introduce uncertainties in the minds of participants who realistically fear betrayal.

The fact that the case at bar is a civil case should not diminish the importance of the propriety of the grand

jury. Taking the articles at face value, there appears to have been a breach of confidentiality. Whether the underlying action is civil or criminal should not dictate or control the analysis recited herein. As the Supreme Court in *Bowden* stated, "the constitutional guarantees to one's reputation makes no distinction if the underlying case is a civil or criminal case."

The scope of this opinion and its application is intended to be narrow and limited to the particular and unique facts of this case. The court does not support a waiver of a reporter's privilege each time a story predicated upon a "confidential source" suggests that the source may be involved in a criminal act and/or enterprise. This court does intend to afford priority to the disclosure of a source where the suggested criminal activity involves the intended confidential operation of the grand jury system.

The issue before this court is an issue of first impression. This court recognizes that the case at bar is factually distinct from previous cases as well. This court is advocating this departure to protect what we have held as sacred in our system of jurisprudence. If we intend the grand jury system to work as it is intended to work, then we must not allow violations to occur under a claim of privilege. Lastly, and if the subject communications are a total falsehood, we should not allow this privilege to be used for a purpose for which it was not intended.

Allowing grand jury proceedings to be published without appropriate consequences and/or remedies serves only to pervert the grand jury process and to reduce the oath of secrecy to mere rhetoric. The grand jury process has held a high and venerable place as a vehicle of jus-

tice when used as statutorily intended. It plays an important role in fair and effective law enforcement.

## B. *First Amendment Claim*

Qualified reporters' privilege, of which the defendants speak, is rooted in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). *Branzburg* was a consolidated proceeding involving multiple contempt proceedings against the media regarding requested appearances before respective grand juries. All of the petitioners in *Branzburg* received communications from sources in confidence and at least one of the petitioners witnessed the commission of a crime (manufacture of "hash" from marijuana). Each of the petitioners refused to disclose their source claiming protection of a reporter's privilege under the First Amendment to the U.S. Constitution.

The U.S. Supreme Court in *Branzburg* simply rejected the claims of privilege under the First Amendment. Giving historic and current credence to the grand jury process, the court stated that it could not "seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about a crime than to do something about it." *Id.* at 692, 92 S.Ct., 33 L.Ed.2d.

The high court made no distinction between sources engaged in criminal conduct or those who know of criminal conduct by others. In the latter category of cases, the high court held:

"Lest there be any mistake as the breadth of the rejection of the claimed First Amendment privilege, . . . 'there

remain those situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others.' . . . As to this category of informants, the court was equally adamant in rejecting the claim of First Amendment privilege:

"[W]e cannot accept the argument that the public interest in possible future news about crime from undisclosed, unverified sources must take a precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future." *In re: Grand Jury Subpoena, Judith Miller,* 397 F.3d 964, 970 (D.C. Cir. 2005), citing *Branzburg, supra* at 695, 92 S.Ct., 33 L.Ed.2d.

Simply stated, the U.S. Supreme Court decided in *Branzburg* that there is no First Amendment privilege extended to journalists from appearing and testifying before grand juries regardless of any confidence or promise by the reporter to the source. The high court has never reversed *Branzburg* and it has been cited and most recently followed in *In re Grand Jury Subpoena, Judith Miller,* 397 F.3d 964 (D.C. Cir. 2005).

In *Miller,* the Federal Circuit Court for the District of Columbia affirmed the district court's refusal to honor a journalist's and a publisher's claim of First Amendment privilege. Two journalists were summoned to appear before a grand jury investigating the disclosure of a C.I.A. operative. The district court, recognizing the role of the grand jury, held both reporters in contempt for refusing to disclose the confidential source. The court of appeals, relying upon *Branzburg,* affirmed the district court's find-

ing. The Federal Appeals Court also declined to reconsider this decision. See 2005 WL 889719 (D.C. Cir. April 19, 2005).

Since *Branzburg,* some federal circuits have recognized a qualified privilege afforded to journalists under the First Amendment. The United States Court of Appeals for the Third Circuit has indicated that a majority of the Supreme Court justices who participated in *Branzburg* supported some quantum of coverage for reporters. As such, the Third Circuit has adopted a qualified privilege protecting the disclosure of confidential sources and materials. See *Riley v. City of Chester,* 612 F.2d 708 (3d Cir. 1979) (privilege recognized and applied in civil case where plaintiff sought identity of confidential source from news reporter); *United States v. Cuthbertson,* 630 F.2d 139 (3d Cir. 1980) *(Cuthbertson I)* (extending privilege recognized in *Riley* to criminal case and to documents where defendants sought notes of interviews with non-confidential sources); *United States v. Criden,* 633 F.2d 346 (3d Cir. 1980) (applying *Riley* and *Cuthbertson I* in criminal case where defendant sought verification from reporter of conversation with witness who had previously testified that the conversation occurred); see also, *Titan Sports Inc. v. Turner Broad. Sys. (In re Madden),* 151 F.3d 125, 128 (3d Cir. 1998) ("[W]e have recognized that when a journalist, in the course of gathering the news, acquires facts that become a target of discovery, a qualified privilege against compelled disclosure appertains."); *Coughlin v. Westinghouse Broad. & Cable Inc.,* 780 F.2d 340, 350 (3d Cir. 1985) (Becker, J. concurring) ("In the wake of *Branzburg,* courts faced with assertions of reporters' privileges have

proceeded on a case-by-case basis, balancing the reporters' rights against the interests of those seeking information.").

The Pennsylvania appellate courts have adopted the qualified privilege standard as stated by the Third Circuit. *Davis v. Glanton, supra; Commonwealth v. Bowden.* Essentially, a challenge to the qualified privilege requires the court "to balance on the one hand the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case at hand." *Riley v. City of Chester,* 612 F.2d 708, 716 (3d Cir. 1979). The Superior Court in *Davis v. Glanton, supra,* summarized the factors the court must consider in determining whether to sustain the invocation of the qualified privilege:

"*Inquirer* also asserts that the trial court's order is violative of the qualified First Amendment privilege protecting members of the news media from divulging their sources, including unpublished information. See *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir. 1980); *Riley v. City of Chester,* 612 F.2d 708, 714-15 (3d Cir. 1979). This privilege, designed to protect freedom of the press by insuring a free flow of information to reporters, will be overcome only where a demonstrated, specific need for evidence presents a paramount interest to which the privilege must yield. *Riley v. City of Chester, supra* at 715-16, citing *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974). The determination of whether the privilege has been overcome must be made on a case-by-case basis, balancing the rights of reporters under the First Amendment against the interests of those seeking the information the report-

ers possess. *Id.; McMenamin v. Tartaglione,* 590 A.2d 802, 811 (Pa. Commw. 1991). *This balancing of interests will tip in favor of disclosure of information where: (1) the information sought is material, relevant, and necessary; (2) there is a strong showing that it cannot be obtained by alternative means; and (3) the information is crucial to the plaintiff's case. Riley v. City of Chester, supra at 716-17; McMenamin v. Tartaglione, supra." Id.* at 885. (emphasis added)

Acknowledging that the plaintiffs in this case are in fact public officials, the burden of proof is one commensurate with their status. As previously stated, in *New York Times v. Sullivan, supra,* the Supreme Court adopted a privilege of fair comment and honest mistake of fact with regard to public figures, and thus, public officials could not recover damages for defamation absent proof of "actual malice," *i.e.,* that it was made with knowledge of its falsity or with reckless disregard thereof.

In balancing the interests, and in addition to the above, the court must and should consider the protections afforded a litigant by the Pennsylvania Constitution. The Pennsylvania Constitution identifies reputation as a fundamental right that cannot be abridged. Article 1, Section 1 of the Pennsylvania Constitution provides:

"All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and *protecting property and reputation,* and of pursuing their own happiness."

In addition, Article 1, Section 2 specifically provides for a legal remedy for injuries to reputation. Specifically,

"All courts shall be open; and *every man for an injury done him* in his lands, goods, person or *reputation shall have remedy by due course of law and right and justice administered without sale, denial or delay.* Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."

It is evident that a person's constitutional right to reputation has been given the same standing as one's right to life, liberty and property and is not "amenable to be pressed into oblivion by other constitutional provisions." *Norton v. Glenn,* Pa., 580 Pa. 212, 860 A.2d 48, 58 (2004), quoting *Sprague v. Walter, supra.*

The constitutional right to reputation and the reporter's qualified privilege under the First Amendment are, at times, in conflict with one another. Accordingly, the court is compelled to balance the interests and apply the factors annunciated in the Third Circuit decisions that were adopted in *Davis, supra,* and *Bowden, supra.* A party seeking to overcome the qualified reporter's privilege must (1) demonstrate that it has made an effort to obtain the information from another source; (2) demonstrate that the only access to the information sought is through the journalist and [his or her] sources; (3) persuade the court that the information sought is crucial to [its] claim. *Commonwealth v. Bowden, supra,* 838 A.2d at 745. Accordingly, the court is required to do a "case-by-case" analysis applying the balance of the factors enumerated above.

As stated above, and considering the nature of the communication in the case at bar, the source relied upon by the defendant reporter appears to be one close to the

investigation. Plaintiffs have not only requested this information from the reporter, but also relied upon the investigation conducted at the direction of Judge Garb. Furthermore, this court does not expect the plaintiffs to conduct exhaustive inquiries of grand jury participants, all of which are sworn to secrecy. The disclosure of the source in the case at bar addresses the very essence of the matter.

Secondly, from a review of the communication and relying upon the defendants' policy that this information must come from firsthand knowledge, the only likely access to the information is the source itself or the reporter. Unless the source or the reporter spoke to others, there are no other possible avenues to explore without embarking on a comprehensive inquiry involving participants in the grand jury process who are forbidden to speak.

The identity of the source is material and relevant to the plaintiffs' case. The identity of the source, his relationship to the subject grand jury proceeding, if any, and the genesis of the information bears heavily on the issues of actual malice and reckless disregard. Furthermore, the identity of the source is relevant and necessary in determining whether the defendants complied with their own policy before publishing the subject articles.

Lastly, and of course considering the plaintiffs' burden in this case (actual malice), the disclosure of the source is "crucial" to the plaintiffs' case. Information is "crucial" if it is important and relevant to the issue before the court. *United States v. Criden,* 633 F.2d 346, 359 (3d Cir. 1980); *Riley, supra.* Without disclosure of

the source, plaintiffs' ability to prove actual malice will be significantly compromised.

This court firmly believes in the First Amendment and the privileges associated therewith. This court firmly believes in a reporter's freedom to write stories based on confidential sources without the fear or need to divulge that confidential source. American journalism has been founded on these principles. This court does not believe that the privilege afforded to reporters is an absolute privilege without defined parameters. When the privilege asserted undermines the cornerstone of the grand jury's system, as in this case, protecting the operation of the grand jury should be paramount. One's constitutional right to reputation, as well as the public's interest in maintaining grand jury secrecy, has tipped the balance of interests in favor of disclosure.

## ORDER

And now, June 3, 2005, relying upon the foregoing analysis, it is hereby ordered and decreed that the plaintiffs' "motion to compel disclosure of the identity of the unnamed source referred to in newspaper articles published in the January 12, 2004 editions of *The Scranton Times* and *The Tribune*" is hereby granted.